UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | |
|---|---|
| **ARTEMIO ALVAREZ BARRON,** et al., and others similarly situated,<br><br>**Plaintiffs,**<br><br>***v.***<br><br>**STERLING SUGARS SALES CORPORATION,**<br><br>**Defendant**. | CIVIL ACTION No. 6:21-cv-03741<br><br>JUDGE ROBERT T. SUMMERHAYS<br><br>MAGISTRATE JUDGE DAVID J AYO |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiffs provide the following Memorandum of Law in Support of their Motion for Partial Summary Judgment.

# TABLE OF CONTENTS

TABLE OF CONTENTS ........ ii

TABLE OF AUTHORITIES ........ iv

SUMMARY OF UNDISPUTED FACTS ........ 1

STANDARD OF REVIEW ........ 2

ARGUMENT ........ 3

I. Plaintiffs' Work Was Not "Agricultural." ........ 3

A. Plaintiffs Were Not Engaged in Primary Agriculture. ........ 5

B. Plaintiffs Were Not Engaged in Secondary Agriculture. ........ 7

1. Defendant is not a farmer. ........ 7

2. Plaintiffs' work was not performed on a farm. ........ 10

3. Plaintiffs' work was not performed "incident to or in conjunction with" the operations of the contractor sugarcane farms. ........ 11

C. Plaintiffs' Work Does Not Fall Within the IRC Definition of Agricultural Labor ........ 12

II. Defendant is Liable under the FLSA for Failing to Pay Overtime to Plaintiffs ........ 13

A. Plaintiffs Were Employees of Defendant and Defendant is a Covered Employer Under the FLSA ........ 14

B. Defendant Violated the FLSA by Not Paying Plaintiffs 1.5 Times Their Regular Rate of Pay ........ 14

C. Defendant Has Not Carried its Burden to Prove an Exemption to the Overtime Provision of the FLSA ........ 16

III. Defendant Improperly Paid Plaintiffs the H-2A AEWR instead of the Higher OEWS Prevailing Wage Rate for the Non-Agricultural Work Performed ........ 18

A. Defendant Breached Its Employment Contract with Plaintiffs by Failing to Pay Highest Applicable Wage ........ 18

1. The Job Orders and Applications for Temporary Employment Certifications Constitute Valid Employment Contracts Between Plaintiffs and Defendant. ........ 19

a. Plaintiffs' employment contracts required payment of the "Federal minimum wage." ....22

b. The applicable federal minimum wage under Plaintiffs' contracts was the OEWS rate for the type of work they performed. ....24

c. Interpreting the contract to only guarantee the AEWR would be unlawful and contrary to public policy for the non-agricultural work performed by Plaintiffs. ....28

2. By Paying Plaintiffs the AEWR Instead of the Higher OEWS Prevailing Wage For Their Non-Agricultural Work Performed, Defendant Breached Its Employment Contracts with Plaintiffs ....32

B. Plaintiffs Are Entitled to the OEWS Prevailing Wage Rate Based on a Theory of Unjust Enrichment ....32

C. Defendant Owes Plaintiffs Their Unpaid Wages Under the Louisiana Wage Payment Act ....35

IV. Plaintiffs Are Owed Their Unpaid Overtime and Regular Wages at the OEWS Prevailing Wage Rate, Liquidated Damages, and Reasonable Attorney's Fees ....35

A. Plaintiffs Are Owed Unpaid Wages for All Years Employed by Defendant ....36

B. Plaintiffs are Entitled to Liquidated Damages for the FLSA Three-Year Willful Period ....38

1. Defendant Fails to Establish Its Defense Under 29 U.S.C. § 259 ....39

2. Defendant Has Failed to Show Evidence of Good Faith Necessary to Avoid Liquidated Damages under 29 U.S.C. § 260 ....41

3. Plaintiffs Are Entitled to the FLSA's Three-Year Statute of Limitations Under 29 U.S.C. § 255 for Willful Violations ....47

C. Plaintiffs Are Entitled to Reasonable Attorney's Fees ....48

CONCLUSION ....49

# TABLE OF AUTHORITIES

## CASES

*Adams v. All Coast, L.L.C.*,
15 F.4th 365 (5th Cir. 2021) ....................16

*AFL-CIO v. Brock*,
835 F.2d 912 (D.C. Cir. 1987) ....................24

*Alfaro-Huitron v. Cervantes Agribusiness*,
982 F.3d 1242, 1247 (10th Cir. 2020) ....................29

*Alfred L. Snapp & Son, Inc. v. Puerto Rico*,
458 U.S. 592 (1982) ....................25

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986) ....................3

*Arnold v. Ben Kanowsky, Inc.*,
361 U.S. 388 (1960) ....................16

*Arriaga v. Florida Pacific Farms, LLC*,
305 F.3d 1228 (11th Cir. 2002) ....................25

*Baker v. Maclay Props. Co.*,
648 So.2d 888 (La. 1995) ....................33

*Barcellona v. Tiffany English Pub, Inc.*,
597 F.2d 464 (5th Cir. 1979) ....................41

*Bayou Lawn & Landscape Services v. Johnson*,
173 F.Supp.3d 1271 (N.D. Fla. 2016) ....................24, 25

*Bayside Enterprises, Inc. v. N.L.R.B.*,
429 U.S. 298 (1977) ....................7, 8, 10

*Bernard v. IBP, Inc. of Nebraska*,
154 F.3d 259 (5th Cir. 1998) ....................38

*Brennan v. Six Flags Over Georgia Ltd.*,
474 F.2d 18 (5th Cir. 1973) ....................17

*Brock v. Wilamowsky,*
833 F.2d 11 (2d Cir. 1987) ....................41

*Brooklyn Sav. Bank*,
324 U.S. 697 (1945) .......................................................................................... 40, 46

*Buero v. Amazon.Com Services, Inc.*,
61 F.4th 1031 (9th Cir. 2023) .......................................................................................... 24

*Camargo v. Trammell Crow Interest Co.*,
318 F.Supp.2d 443 (E.D. Tex. 2004) .......................................................................................... 17

*Carver v. Capital Area Transit Sys.*,
No. 21-281-RLB, 2022 WL 1123786 (M.D. La. 2022) .......................................................................................... 13

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .......................................................................................... 3

*Chapman v. Durkin*,
214 F.2d 36 (5th Cir. 1954) .......................................................................................... 10

*Chavez v. City of Albuquerque*,
630 F.3d 1300 (10th Cir. 2011) .......................................................................................... 16

*Citgo Petroleum Corp. v. Lake Charles Metal Trades Council*,
175 F. Supp. 3d 662 (W.D. La. 2016) .......................................................................................... 2, 3

*Conner v. Cleveland County, N. Carolina*,
22 F.4th 412 (4th Cir. 2022) .......................................................................................... 37

*Cuellar-Aguilar v. Deggeller Attractions, Inc.*,
812 F.3d 614 (8th Cir. 2015) .......................................................................................... 24, 26

*Dacar v. Saybolt, LP*,
914 F.3d 917 (5th Cir. 2018) .......................................................................................... 41

*Espinoza v. West Coast Tomato Growers, LLC*,
No. 14-CV-2984, 2016 WL 4468175 (S.D. Cal. Aug. 24, 2016) .......................................................................................... 25

*Faludi v. U.S. Shale Solutions, LLC*,
950 F.3d 269 (5th Cir. 2020) .......................................................................................... 13, 17

*Farmers Reservoir & Irrigation Co. v. McComb*,
337 U.S. 755 (1949) .......................................................................................... 4, 12

*Florida Sugar Cane League, Inc. v. Usery*,
531 F.2d 299 (5th Cir. 1976) .......................................................................................... 24

*Foundation for Fair Contracting, Inc. v. G & M Eastern Contracting & Double E, LLC*,

259 F. Supp. 2d 329 (D.N.J. 2003) ....................................................................37

*Gagnon v. United Technisource, Inc.*,
607 F.3d 1036 (5th Cir. 2010) ....................................................................15

*Garcia v. Stewart*,
531 F.Supp.3d 194 (D.D.C. 2021) ....................................................................23

*Granger v. Christus Health C. Louisiana*,
144 So. 3d 736 (La. 2013)....................................................................20

*Guidry v. Epic Diving & Marine Servs. LLC*,
411 F. Supp. 3d 389 (W.D. La. 2019) ....................................................................3

*Hernandez v. Siri & Son Farms, Inc.*,
No. 6:20-cv-669, 2021 WL 4999022 (D. Ore. Sep. 20, 2021)..........................................25

*Higgins v. Spencer*,
531 So. 2d 768, 770 (La. Ct. App.)....................................................................21

*Hobbs v. EVO Inc.*,
7 F.4th 241 (5th Cir. 2021) ....................................................................16

*Hodgson v. SquareD Co.*,
459 F.2d 805 (6th Cir. 1972) ....................................................................39

*Hodgson v. Wittenburg*,
464 F.2d 1219 (5th Cir. 1972)....................................................................17

*Holly Farms Corp. v. N.L.R.B.*,
517 U.S. 392 (1996)....................................................................6, 12

*In re Blas Cadena Jr. d/b/a Cadena Trucking*,
BALCA Case No. 2019-TLC-00062 (DOL Office of Administrative Law Judges).12, 13

*In re Global Horizons, Inc.*,
Case No. 2010-TAE-00002 (DOL Office of Administrative Law Judges), Order of Dec. 17, 2010 ....................................................................27

*Johnson v. Heckman Water Resources (CVR), Inc.*,
758 F.3d 627 (5th Cir. 2014) ....................................................................14

*King v. Univ. Healthcare Sys., L.C.*,
645 F.3d 713 (5th Cir. 2011) ....................................................................41

*Knecht v. Bd. of Trustees for State Colleges & Universities & Nw. State Univ.*,

591 So. 2d 690 (La. 1991)....22

*Leger v. Tyson Foods, Inc.*,
95-1055 (La. App. 3 Cir. 1/31/96), 670 So. 2d 397....20

*Limoneira Co. v. Wirtz*,
225 F. Supp. 961 (S.D. Cal. 1963)....23

*Lopez v. Fish*,
No. 2:11-CV-113, 2012 WL 2126856 (E.D. Tenn. May 21, 2012)....18

*Louisiana Forestry Ass'n, Inc. v. Sec. of Labor*,
745 F.3d 653 (3d Cir. 2014)....24, 26

*Louisiana Forestry Association v. Solis*,
889 F.Supp.2d 711 (E.D. Pa. 2012)....24

*Mascagni v. Schlumberger Tech Corp.*,
No. CV 16-439, 2017 WL 3648315 (W.D. La. Aug. 22, 2017)....17

*Matter of Placid Oil Co.*,
932 F.2d 394 (5th Cir. 1991)....2, 17

*McLaughlin v. Richland Shoe Co.*,
486 U.S. 128 (1988)....46, 47

*Medina-Arreguin v. Sanchez*,
398 F. Supp.3d 1314 (S.D. Ga. 2019)....20

*Mencia v. Allred*,
808 F.3d 463 (10th Cir. 2015)....27, 30

*Meza v. Intelligent Mexican Mktg., Inc.*,
720 F.3d 577 (5th Cir. 2013)....16

*Mireles v. Frio Foods, Inc.*,
899 F.2d 1407 (5th Cir.1990)....38, 41

*Mitchell v. Huntsville Wholesale Nurseries, Inc.*,
267 F.2d 286 (5th Cir. 1959)....11

*Nat'l Automatic Laundry & Cleaning Council v. Shultz*,
443 F.2d 689 (D.C. Cir. 1971)....39

*N.C. Growers' Ass'n, Inc. v. United Farm Workers*,
702 F.3d 755 (4th Cir. 2012)....29

*Palma Ulloa v. Fancy Farms, Inc.*,
762 Fed. Appx. 859 (11th Cir. 2019).....20

*Parrish v. Premier Directional Drilling*,
917 F.3d 369 (5th Cir. 2019).....13

*Payphone Connection Plus, Inc. v. Wagners Chef, LLC*,
276 So. 3d 589 (La. App. 2019).....18

*Perez-Benites v. Candy Brand, LLC*,
No. 1:07-cv-1048, 2011 WL 1978414 (W.D. Ark. May 20, 2011).....25

*Preis, PLC v. Daily*,
2019-700 (La. App. 3 Cir. 3/25/20), 297 So. 3d 853.....28

*Production Farm Management v. Brock*,
767 F.2d 1368 (9th Cir. 1985).....24

*Ramirez v. Statewide Harvesting & Hauling, LLC*,
997 F.3d 1356 (11th Cir. 2021).....10

*Ramirez v. Statewide Harvesting & Hauling, LLC*,
No. 8:17-cv-1753-T-35AEP, 2019 WL 3383622 (M.D. Fla. May 24, 2019).....9

*Ramos v. Al-Bataineh*,
599 F. App'x 548 (5th Cir. 2015).....47

*Reich v. Bay, Inc.*,
23 F.3d 110 (5th Cir. 1994).....46, 47

*Richlin Sec. Serv. Co. v. Chertoff*,
553 U.S. 571 (2008).....37

*Roy v. Cty. of Lexington*,
141 F.3d 533 (4th Cir. 1998).....41

*S. Jefferson Davis Parkway, LLC v. Williams*,
165 So.3d 1211 (La. App. 2015).....18

*Singer v. City of Waco*,
324 F.3d 813 (5th Cir. 2003).....38, 47

*Salazar-Calderon v. Presidio Valley Farmers Ass'n*,
765 F.2d 1334 (5th Cir. 1985).....20, 24, 29

*Sanderson Farms, Inc. v. N.L.R.B.*,
335 F.3d 445 (5th Cir. 2003) .......... 8

*Sandoval Cervantes v. Spring Meadow Nursery, Inc.*,
No. 1:20-cv-1132, 2021 WL 5310914 (W.D. Mich. 2021) .......... 23

*Shoreham Cooperative Apple Producers, Inc. v. Donovan*,
764 F.2d 135 (2d Cir. 1985) .......... 25

*Skipper v. Superior Dairies, Inc.*,
512 F.2d 409 (5th Cir. 1975) .......... 17

*Solis v. Hoogland's Nursery, LLC*,
372 F. App'x 528 (5th Cir. 2010) .......... 40

*Steele v. Leasing Enters., Ltd.*,
826 F.3d 237 (5th Cir. 2016) .......... 41

*Stewart v. Murphy*,
174 F.3d 530 (5th Cir.1999) .......... 3

*Tallulah Const., Inc. v. Ne. Louisiana Delta Cmty. Dev. Corp.*,
2007-1029 (La. App. 4 Cir. 4/23/08), 982 So. 2d 225 .......... 28

*Tech. Indus., Inc. v. Banks*,
419 F. Supp. 2d 903 (W.D. La. 2006) .......... 28

*Thomas v. Ameritas Life Ins. Corp.*,
34 F.4th 395 (5th Cir. 2022) .......... 20

*Tijerina-Salazar v. Venegas*,
No. PE:19-cv-74, 2022 WL 1927007 (W.D. Tex. June 3, 2022) .......... 25

*U.S. ex rel. International Brotherhood of Electrical Workers v. Farfield Co.*,
No. 09-4230, 2019 WL 7844585 (E.D. Pa., Nov. 29, 2019) .......... 37

*Vera v. Tue*,
73 F.3d 604 (5th Cir.1996) .......... 3

*Vining v. Bardwell*,
482 So.2d 685 (La.App. 1st Cir.1985) .......... 22

*Walling v. Helmerich & Payne*,
323 U.S. 37 (1944) .......... 13

*Walling v. Wall Wire Prods. Co.*,
161 F.2d 470 (6th Cir.1947) ....................................................................................16

*Walton v. United Consumers Club*,
786 F.2d 303 (7th Cir. 1986) ....................................................................................40

*Wirtz v. Osceola Farms Co.*,
372 F.2d 584 (5th Cir. 1967) .............................................................. 7, 8, 9, 11, 44

*Woodard v. Carol*,
No. 2:21-CV-0059, 2022 WL 4479123 (W.D. La. Sept. 26, 2022) ..............................2, 17

*Zannikos v. Oil Inspections (U.S.A.), Inc.*,
605 F. App'x 349 (5th Cir. 2015) ..............................................................................38

**STATUTES**

8 U.S.C. § 1101(a)(15)(H)(ii)(a) ..........................................................................3, 4, 29

8 U.S.C. § 1188 ..........................................................................................................19

8 U.S.C. § 1188(a)(1)..................................................................................................29

20 U.S.C. § 260 ..........................................................................................................41

26 U.S.C. § 3121(g)(1) ...........................................................................................5, 12

26 U.S.C. § 3121(g)(2) ...............................................................................................12

26 U.S.C. § 3121(g)(3) ...............................................................................................13

26 U.S.C. § 3121(g)(4) ...............................................................................................12

26 U.S.C. § 3121(g)(5) ...............................................................................................12

29 U.S.C. § 152(3) .......................................................................................................8

29 U.S.C. § 157 ............................................................................................................8

29 U.S.C. § 201 et seq ..................................................................................................1

29 U.S.C. § 203(f).........................................................................................................7

29 U.S.C. § 203(s)(1)(A)..............................................................................................14

29 U.S.C. § 207 ...........................................................................................................13

29 U.S.C. § 207(a)....................................................14

29 U.S.C. § 213(b)(12) ....................................................3

29 U.S.C. § 213(f) ....................................................4

29 U.S.C. § 216(b) ....................................................13, 40 48

29 U.S.C. § 255 ....................................................38, 46

29 U.S.C. § 259 ....................................................36, 38, 39

29 U.S.C. § 260 ....................................................38, 46

40 U.S.C. § 3142(a) ....................................................24

La. Civ. Code Ann. art. 1971....................................................22

La. Civ. Code Ann. art. 2054....................................................22

La. Civ. Code art. 1918 ....................................................21

La. Civ. Code art. 1927 ....................................................21

La. Civ. Code art. 1975 ....................................................22

La. Civ. Code art. 2298 ....................................................33

La. Stat. Ann. § 9:1515....................................................37

La. Stat. Ann. § 23:632....................................................48

Louisiana Revised Statutes 23:631 ....................................................35

Louisiana Revised Statutes 23:632 ....................................................35

**RULES**

Adverse Effect Wage Rate Methodology for the Temporary Employment of H-2A Nonimmigrants in Non-Range Occupations in the United States, 88 FR 12760-01 (Feb. 28, 2023) ....................................................30

Fed. R. Civ. P. 56(c) ....................................................2

Temporary Agricultural Employment of H-2A Aliens in the United States; Final Rule, 75 Fed. Reg. 6884 (Feb. 12, 2010) ........................................................................................ 29-30

20 CFR § 653.501(c)(1)(i) ........................................................................................32

20 C.F.R. § 655.0(a)........................................................................................29

20 C.F.R. § 655.1(a)........................................................................................29

20 C.F.R. § 655.10(b) ........................................................................................26

20 C.F.R. § 655.10(b)(2) ........................................................................................16, 18, 31

20 C.F.R. § 655.20(a)(1) ........................................................................................27

20 C.F.R. § 655.40-46 ........................................................................................30

20 C.F.R. § 655.100 ........................................................................................29, 31

20 C.F.R. § 655.100(a)(1)(ii)........................................................................................31

20 C.F.R. § 655.103(a) ........................................................................................29

20 C.F.R. § 655.103(b)........................................................................................19, 23, 29

20 C.F.R. § 655.103(c) ........................................................................................4

20 C.F.R. § 655.120 ........................................................................................3

20 C.F.R. § 655.120(a) ........................................................................................23, 27

20 C.F.R. § 655.120(b)........................................................................................29

20 C.F.R. § 655.122. ........................................................................................19

20 C.F.R. § 655.122(l)........................................................................................23

20 C.F.R. § 655.122(q)........................................................................................19

20 C.F.R. § 655.132 ........................................................................................43

20 C.F.R. § 655.135 ........................................................................................23

20 C.F.R. § 655.135(e) ........................................................................................43, 46

20 C.F.R. § 655.153-156 ........................................................................................30

29 C.F.R. § 103(b)....40

29 C.F.R. § 259(b) ....39

29 C.F.R. § 501.3 ....19

29 C.F.R. § 501.3(b) ....4

29 C.F.R. § 501.5 ....31

29 C.F.R. § 501.20(d)(vii)....31

29 C.F.R. § 655.101 ....40

29 C.F.R. § 655.103 ....26

29 C.F.R. § 778.315 .... 15, 37

29 C.F.R. § 778.5 ....15

29 C.F.R. § 780.11 ....17

29 C.F.R. § 780.105(b)....6

29 C.F.R. § 780.105(b) and (c)....4

29 C.F.R. § 780.129 ....11

29 C.F.R. § 780.131 ....9

29 C.F.R. § 780.133 ....10

29 C.F.R. § 780.134 ....10

29 C.F.R. § 780.138 ....11

29 C.F.R. §§ 790.13–.19 ....38

29 C.F.R. § 790.13 ....38, 39

29 C.F.R. §§ 790.13(a) ....39

29 C.F.R. § 790.14 ....39

29 C.F.R. § 790.16 ....39

29 C.F.R. § 790.19 .......................................................................................................39

29 C.F.R. part 501 .......................................................................................................19

52 Fed. Reg. 16770 (May 5 ,1987) .......................................................................................23

52 Fed. Reg. 6774 (May 5, 1987) .......................................................................................23

73 Fed. Reg. 8550 (Feb. 13, 2008).......................................................................................34

86 Fed. Reg. 62126 .......................................................................................................24

**OTHER AUTHORTIES**

Executive Order 14026, April 27, 2021 .......................................................................32

U.S. Dept. of Labor, Field Assistance Bulletin 2022-3 ..................................................27, 30

Bureau of Labor Statistics, U.S. Department of Labor, Occupational Employment and Wage Statistics, Frequently Asked Questions, "What does the OEWS program produce?" https://www.bls.gov/oes/oes_ques.htm) .......................................................................34

Bureau of Labor Statistics, U.S. Department of Labor, Occupational Employment and Wage Statistics, Handbook of Methods, Data Sources, https://www.bls.gov/opub/hom/oews/data.htm ..........................................................34

Bureau of Labor Statistics, U.S. Department of Labor, Occupational Employment and Wage Statistics, Handbook of Methods, Calculation, https://www.bls.gov/opub/hom/oews/calculation.htm ......................................................34

Bureau of Labor Statistics, U.S. Department of Labor, Occupational Employment and Wage Statistics, History, https://www.bls.gov/opub/hom/oews/history.htm ..........................................26

Bureau of Labor Statistics, U.S. Department of Labor, Occupational Employment and Wage Statistics, Occupational Classification Home, https://www.bls.gov/soc/ ...................................34

Bureau of Labor Statistics, U.S. Department of Labor, Occupational Employment and Wage Statistics, Standard Occupational Classification, About, 2018 SOC System, https://www.bls.gov/soc/2018/major_groups.htm ......................................................35

Foreign Labor Certification Data Center, https://www.flcdatacenter.com/ .................................36

## SUMMARY OF UNDISPUTED FACTS[1]

Plaintiffs are 31 migrant workers from Mexico who were employed by Sterling Sugars Sales Corporation ("Defendant"), an H-2A labor contractor, in Franklin, Louisiana under the federal H-2A agricultural work visa program between 2018 and 2022. Facts 33, 35, 38, 41–42, 45–48, 50, 61, 63, 65–95. Defendant obtained Plaintiffs' H-2A visas, and paid them the corresponding agricultural wage rates, by misrepresenting in their H-2A applications and job offers that Plaintiffs would be employed as agricultural workers. Facts 43–44, 50, 61, 103, 143. They were not. Facts 15–17, 20, 23–26, 29–30, 32, 36, 41, 51–52, 54-56, 58, 96, 130–138. Instead, Defendant employed Plaintiffs as heavy truck drivers transporting harvested sugarcane from dozens of independent sugarcane farms in Louisiana back to the sugar mill of its parent company, Sterling Sugars, LLC, as drivers shuttling sugarcane exclusively within the mill area, or as mechanics at the mill.[2] Facts 133–138. Plaintiffs' supervisors are employees of Sterling Sugars, LLC. Facts 7–8, 10–12. Defendant did not pay Plaintiffs overtime wages of 1.5 times their regular hourly rate for hours worked over 40 in a workweek, in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.* Facts 99, 103, 109–111. Furthermore, through its misuse of the H-2A program, Defendant availed itself of the H-2A program's lower adverse

[1] Plaintiffs' separate "Statement of Undisputed Material Facts," containing a more detailed "statement of the material facts as to which the moving party contends there is no genuine issue to be tried," is attached hereto as Exhibit 1, in compliance with the Western District of Louisiana's Local Rule 56.1. These facts will be cited as "Fact ___." The record evidence cited in the Statement of Undisputed Material Facts is attached thereto as exhibits, and is authenticated, as needed, by the Declaration of Plaintiffs' counsel Nicole Bucheri, attached hereto as Exhibit 2.

[2] The vast majority of Plaintiffs were employed as heavy truck drivers transporting sugarcane from independent farms to the Sterling Sugars mill. Facts 133, 138. Two Plaintiffs, Jesus Antonio Rodriguez Penuelas and Pedro Daniel Romero Ruelas, performed maintenance and repair work at the Sterling mill on trucks and other equipment used to transport sugarcane for the 2021 season, but were heavy truck drivers in their other seasons of employment. Fact 136. Plaintiff Jesus Parra Martinez worked exclusively within the mill area shuttling sugarcane around, and some Plaintiffs shuttled sugarcane within the mill for a limited number of discrete workweeks. Facts 137–138; *see* Section I.A., below.

effect wage rate ("AEWR"), which applies to agricultural workers, and did not pay Plaintiffs the higher prevailing wage rate for heavy truck drivers, light truck drivers, or mechanics that would have applied had Defendant correctly brought Plaintiffs pursuant to the federal H-2B non-agricultural work visa program. Facts 103–109, 117–126. Defendant violated Plaintiffs' employment contracts and was unjustly enriched by underpaying them. Plaintiffs move for partial summary judgment on the issues of their wage claims under contract, unjust enrichment, the Louisiana Wage Payment Act ("LWPA"), and overtime liability under the FLSA. In support thereof, Plaintiffs will show that they were not employed in agricultural work and, therefore, Defendant (1) violated the FLSA by failing to pay overtime wages at the applicable regular rate; (2) breached its employment contract with Plaintiffs, or was unjustly enriched, by failing to pay the highest applicable wage rate for their work and as guaranteed in their H-2A employment agreements; and (3) violated the LWPA by failing to pay their wages due under the terms of their employment.

## STANDARD OF REVIEW

The Court should grant a moving party's motion for summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, when viewed in the light most favorable to the non-moving party, indicate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Citgo Petroleum Corp. v. Lake Charles Metal Trades Council*, 175 F. Supp. 3d 662, 667 (W.D. La. 2016) (citing Fed. R. Civ. P. 56(c)). In a case set for bench trial, a court has greater discretion to weigh evidence and draw inferences. *Matter of Placid Oil Co.*, 932 F.2d 394 (5th Cir. 1991); *Woodard v. Carol*, No. 2:21-CV-0059, 2022 WL 4479123, at *3 (W.D. La. Sept. 26, 2022). A fact is "material" if its existence or nonexistence "might affect the outcome of the suit

under governing law." *Citgo Petroleum*, 175 F. Supp. 3d at 667 (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986)). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id*. (citing *Stewart v. Murphy*, 174 F.3d 530, 533 (5th Cir.1999)). "As to issues which the non-moving party has the burden of proof at trial, the moving party may satisfy this burden by demonstrating the absence of evidence supporting the non-moving party's claim." *Id*. (citing *Vera v. Tue*, 73 F.3d 604, 607 (5th Cir.1996)). Once the moving party satisfies this burden, "[t]he non-moving party must demonstrate by way of affidavit or other admissible evidence that there are genuine issues of material fact or law." *Id*. (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). The nonmoving party "cannot survive a summary judgment motion by resting on the mere allegations of its pleadings." *Guidry v. Epic Diving & Marine Servs. LLC*, 411 F. Supp. 3d 389, 394 (W.D. La. 2019).

## ARGUMENT

### I. Plaintiffs' Work Was Not "Agricultural."

Whether Plaintiffs were employed in agriculture determines both their entitlement to overtime wages under the FLSA and to a wage higher than the agricultural AEWR rate they were paid, under the H-2A agricultural program, for Plaintiffs' breach of contract and unjust enrichment claims. The FLSA's overtime provision expressly exempts workers "employed in agriculture." 29 U.S.C. § 213(b)(12). For Plaintiffs' contract and unjust enrichment claims, the H-2A program is intended only for agricultural work, 8 U.S.C. § 1101(a)(15)(H)(ii)(a), and according to H-2A rules and Plaintiffs' H-2A employment contracts, Defendant promised to pay Plaintiffs "the highest of the AEWR, the prevailing hourly wage or piece rate, the agreed-upon collective bargaining wage, or the Federal or State minimum wage." 20 C.F.R. § 655.120; Fact 148. *See* Section III.A., below. Because Plaintiffs were not employed in agricultural work, they

are entitled to overtime and an equal amount in liquidated damages, and to be paid at the higher Occupational Employment and Wage Statistics ("OEWS") prevailing wage rate for the type of non-agricultural work they performed.

Under the Immigration and Nationality Act, H-2A workers may be admitted to perform agricultural labor and services as defined by the FLSA and Section 3121(g) of the Internal Revenue Code. 8 U.S.C. §1101(a)(15)(H)(ii)(a); 29 C.F.R. § 501.3(b), and 20 C.F.R. § 655.103(c). The FLSA, 29 U.S.C. § 213(f), defines "agriculture" as:

> farming in all its branches and among other things includes the cultivation and tillage of the soil, dairying, the production, cultivation, growing, and harvesting of any agricultural or horticultural commodities (including commodities defined as agricultural commodities in section 1141j(g) [2] of title 12), the raising of livestock, bees, fur-bearing animals, or poultry, and any practices (including any forestry or lumbering operations) performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market.

This definition has since been interpreted by the U.S. Supreme Court and incorporated into U.S. Department of Labor ("USDOL") regulations as including "primary" and "secondary" agriculture. *Farmers Reservoir & Irrigation Co. v. McComb*, 337 U.S. 755, 762–63 (1949); 29 C.F.R. § 780.105(b) and (c).

> (b) First, there is the primary meaning. This includes farming in all its branches. Listed as being included "among other things" in the primary meaning are certain specific farming operations such as cultivation and tillage of the soil, dairying the production, cultivation, growing and harvesting of any agricultural or horticultural commodities and the raising of livestock, bees, fur-bearing animals or poultry. If an employee is employed in any of these activities, he is engaged in agriculture regardless of whether he is employed by a farmer or on a farm.
>
> (c) Then there is the secondary meaning of the term. The second branch includes operations other than those which fall within the primary meaning of the term. It includes any practices, whether or not they are themselves farming practices, which are performed either by a farmer or on a farm as an incident to or in conjunction with "such" farming operations.

29 C.F.R. § 780.105(b) and (c) (internal citations omitted).

The Internal Revenue Service defines agriculture very similarly to the FLSA. 26 U.S.C. § 3121(g)(1).[3] The regulations, caselaw, and evidence in the record establish that Plaintiffs were not engaged in primary or secondary agriculture under the FLSA or H-2A definitions.

### A. Plaintiffs Were Not Engaged in Primary Agriculture.

Plaintiffs were not engaged in primary agriculture. As detailed above, "primary agriculture" can be identified by reviewing the specific tasks performed by an employee, such as

---

[3] **(g) Agricultural labor**

For purposes of this chapter, the term "agricultural labor" includes all service performed-

(1) on a farm, in the employ of any person, in connection with cultivating the soil, or in connection with raising or harvesting any agricultural or horticultural commodity, including the raising, shearing, feeding, caring for, training, and management of livestock, bees, poultry, and fur-bearing animals and wildlife;

(2) in the employ of the owner or tenant or other operator of a farm, in connection with the operation, management, conservation, improvement, or maintenance of such farm and its tools and equipment, or in salvaging timber or clearing land of brush and other debris left by a hurricane, if the major part of such service is performed on a farm;

(3) in connection with the production or harvesting of any commodity defined as an agricultural commodity in section 15(g) of the Agricultural Marketing Act, as amended (12 U.S.C. 1141j), or in connection with the ginning of cotton, or in connection with the operation or maintenance of ditches, canals, reservoirs, or waterways, not owned or operated for profit, used exclusively for supplying and storing water for farming purposes;

(4)(A) in the employ of the operator of a farm in handling, planting, drying, packing, packaging, processing, freezing, grading, storing, or delivering to storage or to market or to a carrier for transportation to market, in its unmanufactured state, any agricultural or horticultural commodity; but only if such operator produced more than one-half of the commodity with respect to which such service is performed;

(B) in the employ of a group of operators of farms (other than a cooperative organization) in the performance of service described in subparagraph (A), but only if such operators produced all of the commodity with respect to which such service is performed. For purposes of this subparagraph, any unincorporated group of operators shall be deemed a cooperative organization if the number of operators comprising such group is more than 20 at any time during the calendar year in which such service is performed;

(C) the provisions of subparagraphs (A) and (B) shall not be deemed to be applicable with respect to service performed in connection with commercial canning or commercial freezing or in connection with any agricultural or horticultural commodity after its delivery to a terminal market for distribution for consumption; or

(5) on a farm operated for profit if such service is not in the course of the employer's trade or business.

As used in this subsection, the term "farm" includes stock, dairy, poultry, fruit, fur-bearing animal, and truck farms, plantations, ranches, nurseries, ranges, greenhouses or other similar structures used primarily for the raising of agricultural or horticultural commodities, and orchards.

"cultivation and tillage of the soil, dairying, the production, cultivation, growing and harvesting of any agricultural or horticultural commodities and the raising of livestock." 29 C.F.R. § 780.105(b). Here, there is no dispute that Plaintiffs did not perform such tasks for Defendant. None of the Plaintiffs cultivated or tilled soil, produced, grew, cultivated, or harvested sugarcane (or any other agricultural commodity), nor did they work in the fields of any independent farm. Facts 15–17, 20, 63, 130–138.[4]

Rather, the majority of Plaintiffs were employed by Defendant as heavy truck drivers who departed from Sterling Sugar, LLC's mill to independent sugarcane farms in Louisiana, where harvested sugarcane was loaded onto their trucks, and then transported the sugarcane back to Sterling Sugar LLC's sugar mill for processing. Facts 133, 136–138. In 2021, Plaintiffs Jesus Antonio Rodriguez Penuelas and Pedro Daniel Romero Ruelas performed maintenance at the Sterling Sugars, LLC mill on trucks and other equipment used to transport sugarcane. Fact 136. Plaintiff Jesus A. Parra Martinez drove utility vehicles exclusively within the mill area shuttling sugarcane around, and some Plaintiffs shuttled sugarcane within the mill for a limited number of discrete workweeks. Facts 137–138. It is well-established that such activities do not constitute "primary agriculture." *See, e.g., Holly Farms Corp. v. N.L.R.B.*, 517 U.S. 392, 398 (1996) ("'Primary farming' includes the occupations listed first in § 3(f): 'the cultivation and tillage of

[4] Though Defendant has stated that Plaintiffs "may have engaged in harvesting or loading of sugarcane and/or sugarcane production" in response to requests for admissions, it has produced zero evidence to substantiate this assertion. In fact, the record unequivocally establishes that in 2018, when Defendant first entered the H-2A program, *none* of its employees engaged in harvesting. Facts 29, 30. Thus, no Plaintiff could have engaged in primary agriculture in 2018. In subsequent years, Defendant claims it employed a small number of workers at select farms to operate sugarcane harvesting equipment in the fields of farmers *with whom it contracted*, but Plaintiffs' names do not appear on Defendant's list of "field workers," and Plaintiffs' testimony establishes that they never harvested sugarcane. Facts 18–19, 131–138. Defendant has provided no evidence to the contrary and was unable to identify specifically which workers supposedly harvested sugarcane or engaged in primary agriculture. Fact 132. *See also* Section I.B.1.

the soil, dairying, the production, cultivation, growing, and harvesting of any agricultural or horticultural commodities ... [and] the raising of livestock, bees, fur-bearing animals, or poultry.'") (citing 29 U.S.C. § 203(f)); *Bayside Enterprises, Inc. v. N.L.R.B.*, 429 U.S. 298, 300–01 (1977) (transporting products to or from a farm is not primary farming); *Wirtz v. Osceola Farms Co.*, 372 F.2d 584, 587–90 (5th Cir. 1967) (neither truck drivers engaged in transporting sugarcane from independent growers to employer's mill nor mechanics of agricultural equipment were engaged in primary agriculture).

**B. Plaintiffs Were Not Engaged in Secondary Agriculture.**

Nor were Plaintiffs engaged in secondary agriculture, as that term is defined by FLSA. To meet the FLSA definition of "secondary agriculture," work must have been performed "by a farmer or on a farm as an incident to or in conjunction with such farming operations." 29 U.S.C. § 203(f). Defendant is not a farmer and Plaintiffs' labor was not performed on a farm. Even if the work had been performed by a farmer or on a farm, Plaintiffs' work was not "incident to or in conjunction with" any actual sugarcane farmers' operations. *Id.*

**1. Defendant is not a farmer.**

Defendant is a labor contractor. Facts 16–21, 41. Defendant does not plant, grow, or cultivate sugarcane. Facts 15–17, 24–26, 130–138. It did not have any direct ownership interest in the independent farms for whom it provided labor or the crops those farms harvested. Facts 24–26. It is not a farmer. Rather, Defendant contracts with independent farms that plant, grow, and harvest sugarcane, and provides labor to transport the farms' sugarcane to the Sterling Sugars, LLC mill. Facts 15–21. For the 2019, 2020, and 2021 seasons, Defendant claims it contracted with a small number of those farms to also provide "harvesting" services. Facts 18–19. Defendant admits it did not contract to provide any harvesting services in the 2018 season. Facts 29–30.

Faced with a nearly identical scenario, the Fifth Circuit has held that such an arrangement, whereby a sugar mill provides labor to transport sugarcane from independent farms to the mill, does not constitute secondary agriculture. *Osceola Farms*, 372 F.2d at 586–89. Just as in *Osceola Farms*, Defendant contracted with independent growers to transport sugarcane to the mill, "title to the cane of the independent growers passe[d] to [the mill] at the mill, and risk of loss or destruction prior to delivery at the mill [was] on the grower," and "the perishable nature of the cane is emphasized by [the employer]" as somehow indicative that the work is part of the harvesting. *Id.* at 585–586, 589; Facts 16–17, 24–27. On these same exact facts, the Fifth Circuit rejected the employer's argument that transporting sugarcane to the mill and maintaining harvesting equipment off the farm constituted part of the harvesting process. *Id.* at 589–90.

Defendant cannot hide behind the farmer status of the independent farms from whom Plaintiffs transported the sugarcane. The U.S. Supreme Court has clearly held that it is the work performed *for the employer*, and not the work performed by the independent farmer, that determines whether the worker was engaged in secondary agriculture. *See Bayside Enters., Inc. v. N.L.R.B.*, 429 U.S. 298, 302–03 (1977)[5] ("[s]ince the status of the drivers is determined by the character of the work which they perform for their own employer, the work of the contract farmer cannot make the drivers agricultural laborers."); *accord Sanderson Farms, Inc. v. N.L.R.B.*, 335 F.3d 445, 450–51 (5th Cir. 2003) ("Consistent with the Board's decisions affirmed by the Supreme Court, Sanderson Production is not a farmer when it sends its live-haul drivers to retrieve chickens from independent farms and take them to slaughter. The drivers also

[5] The National Labor Relations Act excludes from coverage any individual employed as an agricultural laborer. *See* 29 U.S.C. § 152(3) (defining "employee") and § 157 (rights of employees). The NLRA does not define "agricultural laborer," but Congress has tied the definition to Section 3(f) of the FLSA. *Bayside Enters.* 335 F.3d at 300 n.6.

cannot derive their status from the work of the independent farms, because these farms do not employ the drivers.").

That some H-2A workers employed by Defendant allegedly harvested sugarcane on a small number of the independent farms, does not make Defendant a "farmer" under the secondary definition of agriculture. Defendant does not own or control the farming operations or the harvested sugarcane on the independent sugarcane farms and its employees engaged in such activities are a minority of its workforce. Facts 16–19.

> Generally, an employer must undertake farming operations of such scope and significance as to constitute a distinct activity, for the purpose of yielding a farm product, in order to be regarded as a "farmer." It does not necessarily follow, however, that any employer is a "farmer" simply because he engages in some actual farming operations of the type specified in section 3(f). Thus, one who merely harvests a crop of agricultural commodities is not a "farmer" although his employees who actually do the harvesting are employed in "agriculture" in those weeks when exclusively so engaged. As a general rule, a farmer performs his farming operations on land owned, leased, or controlled by him and devoted to his own use. The mere fact, therefore, that an employer harvests a growing crop, even under a partnership agreement pursuant to which he provides credit, advisory or other services, is not generally considered to be sufficient to qualify the employer so engaged as a "farmer." Such an employer would stand, in packing or handling the product, in the same relationship to the produce as if it were from the fields or groves of an independent grower. One who engaged merely in practices which are incidental to farming is not a "farmer."

29 C.F.R. § 780.131; *see also Ramirez v. Statewide Harvesting & Hauling, LLC*, No. 8:17-cv-1753-T-35AEP, 2019 WL 3383622 (M.D. Fla. May 24, 2019) (farmer determination not challenged and adopted by *Ramirez v. Statewide Harvesting & Hauling, LLC*, No. 8:17-cv-1753-T-35AEP, 2019 WL11505069, at *5 (M.D. Fla. Sept. 30, 2019)) ("In other words, when a subsidiary and parent company relationship exists, and the subsidiary owns all the 'crops planted, grown, and harvested,' it has 'control over the farming operations,' thereby rendering it eligible for the exemption and the parent company ineligible."); *Osceola Farms,* 372 F.2d at 589 (drivers transporting sugarcane did not work for a farmer or on a farm even though employer

also employed field workers); 29 C.F.R. § 780.133 (employees of a farmer's cooperative association are generally not considered to be employed "by a farmer" under the FLSA, because the association is a distinct, separate entity from the growers who comprise it).

Here, Defendant claims that for the 2019, 2020, and 2021 seasons it contracted with a small number of farms to provide labor to those farms for harvesting tasks. Facts 16–19. However, Defendant has not been able to identify which specific workers performed those tasks, other than those listed on a Field Workers list, none of whom is a Plaintiff in this case. Facts 18, 130–132. Regardless, Defendant did not become a farmer merely because it provided minimal contract labor to a small number of farmers, where those growers retained all ownership interests and risk of loss in the sugarcane at the time the work was performed.

**2. <u>Plaintiffs' work was not performed on a farm</u>.**

Nor did any Plaintiff work on a farm. All of Plaintiffs' work occurred at the Sterling Sugars, LLC mill, on public roads, or, for brief intervals, as they waited for the sugarcane to be loaded into their trucks at independent farms. Facts 51–52, 97, 133, 135–138.

Plaintiffs' work transporting sugarcane between numerous independent farms and Sterling Sugar, LLC's mill is not work performed "on a farm." *See, e.g., Bayside*, 429 U.S. at 301 (drivers transporting products to or from a farm do not work "on a farm"). In fact, USDOL regulations defining the phrase "on a farm" explicitly consider a similar arrangement, and state that "employees of an alfalfa dehydrator engaged in hauling chopped or unchopped alfalfa away from the farms to the dehydrating plant are not employed in a practice performed 'on a farm.'" 29 C.F.R. § 780.134. The Fifth Circuit has repeatedly decided the same. In *Chapman v. Durkin*, 214 F.2d 360, 363 (5th Cir. 1954), it held that transporting fruit away from a farm "cannot be said to be work performed ... on a farm." (internal quotation marks omitted). Again, in *Osceola*

*Farms*, 372 F.2d at 589, the Fifth Circuit held that transporting sugarcane "is not work done on a farm, except to the extent the original movements in picking up loads are on farm property. The rest of each movement is off the farm (some on public highways) and at the mill site." *Id.* at 588; *see also Ramirez v. Statewide Harvesting & Hauling, LLC*, 997 F.3d 1356 (11th Cir. 2021) ("So even work that begins on a farm but is mostly performed away from a farm ordinarily falls outside the exemption.").

It is equally well-established that performing work at a mill, like mechanic work or shuttling sugarcane around the mill, as some Plaintiffs did, does not occur "on a farm." *Osceola*, 372 F.2d at 590 (mechanic work that takes place at "the repair shop is not within the primary meaning of § 3(f) and it cannot fall within the secondary meaning since it is done neither by a farmer nor on a farm").

**3. Plaintiffs' work was not performed "incident to or in conjunction with" the operations of the contractor sugarcane farms.**

Because Defendant is not a farmer and Plaintiffs' work was not performed on a farm, Defendant is not entitled to the FLSA agricultural overtime exemption. "No matter how closely related it may be to farming operations, a practice performed neither by a farmer nor on a farm is not within the scope of the 'secondary' meaning of 'agriculture.'" 29 C.F.R. § 780.129; 29 C.F.R. § 780.138 ("Employees of a grower-operator of a sugarcane mill who transport cane from fields to the mill are not within section 3(f), where such cane is grown by independent farmers on their land as well as by the mill operator"). However, even if the requirement of work being performed on a farm or by a farmer were met, which it is not, Plaintiffs' work would still not be exempt because it is not "as an incident to or in conjunction with such farming operations," those being the operations of a farm for which or on which Plaintiffs worked. *See Mitchell v. Huntsville Wholesale Nurseries, Inc.*, 267 F.2d 286, 290 (5th Cir. 1959) (Even where employer

had other farming operations, employees processing nursery stock purchased from other sources is not incidental to the employer's farming operations, but rather to those other sources' farming operations.) (citing *Farmers Reservoir & Irrigation Co. v. McComb*, 337 U.S. 755, 766 n. 15 (1949)). The phrase incident to or in conjunction with "*such* farming operations" means that the work performed must be related to the employer's "primary farming operations." *Holly Farms Corp. v. N.L.R.B.*, 517 U.S. 392, 402 (1996) (emphasis in original). Where an employer has no primary farming operations, as here, there is no farming work to be incident to or conjoined with. As in *Holly Farms*, the work performed by Plaintiffs was incident to Defendant's mill work, not to the independent farmers' farms. *Id.* at 403–04. Plaintiffs began and ended their days at the mill; were instructed and supervised by Defendant on their daily job orders; and were paid by Defendant. Facts 10–12, 36, 51–52, 55, 96–99, 103, 133, 135–138. To the extent any of them had any interaction with the independent farms, it was in the form of waiting for their trucks to be loaded to take back to the Sterling Sugars, LLC mill. Fact 133. Such work is categorically not incidental to or in conjunction with any farm operations of Defendant.

### C. Plaintiffs' Work Does Not Fall Within the IRC Definition of Agricultural Labor.

For the reasons described above, Plaintiffs' work also does not fall within the H-2A program's "virtually identical" definition of agriculture under 26 U.S.C. § 3121(g). *See* Ex. 3 hereto, *In re Blas Cadena Jr. d/b/a Cadena Trucking,* BALCA Case No. 2019-TLC-00062, (USDOL Office of Administrative Law Judges), Order of July 12, 2019, at 7. Similar to the FLSA definition, the Internal Revenue Code ("IRC") definition of agriculture requires that the services must be performed "on a farm," 26 U.S.C. § 3121(g)(1) and (5), "in the employ of the owner . . . or other operator of a farm," 26 U.S.C. § 3121(g)(2), "in the employ of the operator of a farm," 26 U.S.C. § 3121(g)(4), or "in connection with the production or harvesting of . . . an

agricultural commodity," 26 U.S.C. § 3121(g)(3). As described above in Section I.B.1.–3., Defendant is not the owner or operator of a farm, Plaintiffs' work did not take place on a farm, and their work was not in connection with the harvesting of an agricultural commodity by Defendant, so 26 U.S.C. § 3121(g) does not apply. *See* Ex. 3, *In re Blas Cadena Jr. d/b/a Cadena Trucking,* 2019-TLC-00062, at 8 (collecting USDOL ALJ decisions finding that drivers employed by entities other than the operator of a farm are not performing agricultural services within the Internal Revenue Code when they transport a commodity from the field to a storage or packing facility). Thus, the work performed by Plaintiffs was not agricultural under the FLSA or IRC definitions, meaning that it was not agriculture for purposes of the H-2A program either.

## II. <u>Defendant is Liable under the FLSA for Failing to Pay Overtime to Plaintiffs.</u>

The FLSA requires employers to pay overtime compensation to non-exempt employees who work more than forty hours a week. 29 U.S.C.§ 207; *Faludi v. U.S. Shale Solutions, LLC*, 950 F.3d 269, 272 (5th Cir. 2020); *Carver v. Capital Area Transit Sys.*, No. 21-281-RLB, 2022 WL 1123786, at *4 (M.D. La. 2022). FLSA overtime has two purposes: (a) to compensate employees for the burden of working a workweek in excess of 40 hours, and (b) to spread employment among a greater number of people by making overtime hours more expensive than straight-time hours. *Walling v. Helmerich & Payne*, 323 U.S. 37, 40 (1944). An employer who violates the overtime provisions is liable to affected employees in the amount of the unpaid overtime compensation, plus an additional amount as liquidated damages. 29 U.S.C. § 216(b); *Parrish v. Premier Directional Drilling*, 917 F.3d 369, 379 (5th Cir. 2019).

Plaintiffs have proven the prima facie elements of their FLSA overtime claims: (1) that an employer-employee relationship existed between them and Defendant; (2) that they engaged in activities within the coverage of the FLSA; and (3) that Defendant violated the FLSA's

overtime requirements. *Johnson v. Heckman Water Resources (CVR), Inc.*, 758 F.3d 627, 630 (5th Cir. 2014). The final element, the amount of overtime compensation due, is addressed below, Section IV. *See id.* Defendant, in turn, has not carried its burden to show that an exemption to the FLSA overtime requirements applies to Plaintiffs' work.

### A. **Plaintiffs Were Employees of Defendant and Defendant is a Covered Employer Under the FLSA.**

Plaintiffs were employed by Defendant on H-2A visas during different seasons between 2018 through early 2022. Facts 35, 61, 63, 65-95. Defendant has admitted that Plaintiffs were employed by Defendant at all times relevant to the claims in this case and has produced pay records and time card reports for each Plaintiff demonstrating their dates of employment. Facts 63, 127–28. Those dates of employment by individual Plaintiff are also shown in the summary of voluminous records, Exhibit 4 hereto ("Damages Table").

Defendant further admits that it was engaged in commerce within the meaning of the FLSA, 29 U.S.C. § 203(s)(1)(A). Fact 64. Therefore, Defendant is covered by the overtime provisions of the FLSA. *See* 29 U.S.C. §§ 203(s)(1)(A) and 207(a).

### B. **Defendant Violated the FLSA by Not Paying Plaintiffs 1.5 Times Their Regular Rate of Pay.**

Plaintiffs frequently worked more than 40 hours per workweek and were not paid 1.5 times their regular rate of pay. Facts 103, 109–111. The hours worked by each Plaintiff in each FLSA workweek and the amounts paid by Defendant are shown in the summary of voluminous records synthesizing Defendant's own pay records (payroll and check registers) and hours records (time card reports), attached hereto as Exhibit 4 (Damages Table). *See also* Section IV. These records and Defendant's admissions prove that Plaintiffs were paid straight time at the AEWR rate in effect at the time for all hours worked, including for those hours worked above 40 in a workweek. Facts 103, 109. Defendant never paid its H-2A workers overtime. *Id.*

The "regular rate" of pay applicable to Plaintiffs' work under the FLSA is the OEWS wage rate that corresponds to the type of non-agricultural work performed by Plaintiffs. *See* Section III.A., below. Under the FLSA, the "regular rate" of pay refers to the minimum rate of pay guaranteed to a worker by the terms of his contract or to comply with various federal, state, or local laws. *See* 29 C.F.R. § 778.5 ("Where a higher minimum wage than that set in the Fair Labor Standards Act is applicable to an employee by virtue of such other legislation, the regular rate of the employee, as the term is used in the Fair Labor Standards Act, cannot be lower than such applicable minimum, for the words 'regular rate at which he is employed' as used in section 7 must be construed to mean the regular rate at which he is *lawfully* employed.") (emphasis added); 29 C.F.R. § 778.315 ("compensation for the excess hours of overtime work under the Act cannot be said to have been paid to an employee unless all the straight time compensation due him for the nonovertime hours under his contract (express or implied) or under any applicable statute has been paid."). Thus, the contracted "regular rate" can never be an unlawfully low rate. *See* Section III.A.1.c., below.

In an analogous situation, the Fifth Circuit confirmed the lower court's finding that the "straight time wage" rate listed in an employment contract was not the "regular rate" for purposes of calculating FLSA overtime wages due, in part because the contractual wage rate was so far out of step with the prevailing wage rate published by USDOL for the type of work performed. *See Gagnon v. United Technisource, Inc.*, 607 F.3d 1036, 1039 fn. 2 (5th Cir. 2010) (comparing the contract wage rate to "the minimum hourly wage rate for aircraft painters at the relevant time and area" as listed by USDOL). Thus, the Court was "suspicious of [the employer's] claims that [the employee's] employment contracts were not a scheme to avoid paying overtime. It is difficult to believe that a skilled craftsman would accept a wage so close to

the minimum wage when the prevailing wage for similarly skilled craftsmen was approximately three times the minimum wage." *Id.* at 1041. An employer cannot "artificially lower an employee's regular rate by mischaracterizing a portion of it." *Id.* at 1042; *see also Chavez v. City of Albuquerque*, 630 F.3d 1300, 1305 (10th Cir. 2011) (contract cannot designate an artificially low wage rate to evade the purposes of the FLSA overtime wages due) (citing *Walling v. Wall Wire Prods. Co*., 161 F.2d 470, 473 (6th Cir.1947)). By the same logic, Defendant cannot gain the benefit of an artificially low regular rate (the AEWR rate paid to Plaintiffs), by misusing the H-2A program for non-agricultural work, when the public policies that form the framework of the H-2A program, to not adversely affect wages of U.S. workers in similar work, require payment of the OEWS prevailing wage rate that would have applied if Plaintiffs were properly brought under the H-2B non-agricultural program. *See* Section III.A.1.c., below; 20 C.F.R. § 655.10(b)(2).

### C. **Defendant Has Not Carried its Burden to Prove an Exemption to the Overtime Provision of the FLSA.**

The employer bears the burden of proving the work performed by an employee is exempt under the FLSA. *Adams v. All Coast, L.L.C.*, 15 F.4th 365, 368 (5th Cir. 2021); *Meza v. Intelligent Mexican Mktg., Inc*., 720 F.3d 577, 580–81 (5th Cir. 2013). As discussed above in Section I., Defendant has not carried its burden of proof that the agricultural exemption under the FLSA applied to the work performed by each Plaintiff. *See Hobbs v. EVO Inc.*, 7 F.4th 241 (5th Cir. 2021) (employer not entitled to highly compensated employee or administrative exemption where it failed to show employees were engaged in relevant job activities). To satisfy its burden, the employer must prove facts that show the claimed FLSA exemption is "plainly and unmistakably applicable." *Meza* 720 F.3d at 580–81 (quoting *Arnold v. Ben Kanowsky, Inc*., 361 U.S. 388, 392 (1960) (application of the FLSA's exemptions is "limited to those establishments

plainly and unmistakably within their terms and spirit.")); *Mascagni v. Schlumberger Tech Corp.*, No. CV 16-439, 2017 WL 3648315, at *2 (W.D. La. Aug. 22, 2017).

Defendant has produced no evidence that any Plaintiff engaged in primary or secondary agriculture. *See* Section I., above. In contrast, Plaintiffs have submitted detailed affidavits stating that they did not harvest sugarcane and instead transported sugarcane away from independent farms to the Sterling Sugars, LLC mill or worked within the Sterling Sugars, LLC sugarcane processing facility. *Id.*; Facts 52, 133–138. Even if Defendant had shown that any Plaintiff had ever engaged in a single agricultural task, which it has not, Defendant could only meet its burden by proving that each Plaintiff engaged *only* in agriculture for the entirety of the workweek, because when employees are engaged in a mix of exempt and non-exempt work during a workweek, they are entitled to overtime.[6] Whether an employer is entitled to an exemption is a question of law, *Faludi*, 950 F.3d at 273, and, because this matter is set for a bench trial, the Court has greater discretion to weigh evidence and draw inferences regarding questions of fact, including the nature of an employee's work. *See Matter of Placid Oil Co.*, 932 F.2d 394 (5th Cir. 1991); *Woodard v. Carol*, No. 2:21-CV-0059, 2022 WL 4479123, at *3 (W.D. La. Sept. 26, 2022). On the record before the Court, there is not a genuine issue of material fact as to whether Plaintiffs are exempt from the overtime provisions of the FLSA. Plaintiffs' work plainly is not considered agriculture, and they were entitled to overtime.

[6] Employees who perform a mix of exempt and non-exempt work during a workweek are entitled to overtime pay. 29 C.F.R. § 780.11; *Skipper v. Superior Dairies, Inc.*, 512 F.2d 409, 411 (5th Cir. 1975) (citing *Hodgson v. Wittenburg*, 464 F.2d 1219 (5th Cir. 1972) and *Brennan v. Six Flags Over Georgia Ltd.*, 474 F.2d 18 (5th Cir. 1973); *Camargo v. Trammell Crow Interest Co.*, 318 F.Supp.2d 443, 448 (E.D. Tex. 2004) ("If an employee in the same work week performs both work which is exempt from overtime requirements and work that is not exempt, he is not exempt that week, and the overtime pay requirements of the FLSA are applicable.").

## III. <u>Defendant Improperly Paid Plaintiffs the H-2A AEWR instead of the Higher OEWS Prevailing Wage Rate for the Non-Agricultural Work Performed</u>

[F]ederal cases too numerous to count . . . have held that H-2A workers may pursue state breach of contract claims against employers who fail to comply with clearance orders." *Lopez v. Fish*, No. 2:11-CV-113, 2012 WL 2126856, at *1 (E.D. Tenn. May 21, 2012) (collecting cases). Plaintiffs have brought claims against Defendant for breach of contract and unjust enrichment. Under either theory, the AEWR Defendant paid Plaintiffs is an unlawfully low rate. Not only does this constitute a breach of Defendant's employment contracts, it also contravenes the H-2 programs' explicit stated public interest purposes to ensure that use of foreign H-2 workers will not adversely affect the wages and working conditions of similarly employed U.S. workers performing that kind of work. The only way to achieve these stated purposes is to pay Plaintiffs the arithmetic mean of the OEWS prevailing wage rate in their area of employment for the type of work they actually performed. *See* 20 C.F.R. § 655.10(b)(2).

### A. <u>Defendant Breached Its Employment Contract with Plaintiffs by Failing to Pay Highest Applicable Wage Rate.</u>

Under Louisiana law, "the 'elements of a breach of contract claim are the existence of a contract, the party's breach thereof, and resulting damages.'" *Payphone Connection Plus, Inc. v. Wagners Chef*, LLC, 276 So. 3d 589, 595 (La. App. 2019) (quoting *S. Jefferson Davis Parkway, LLC v. Williams*, 165 So.3d 1211, 1216 (La. App. 2015). For each sugarcane season they worked, Plaintiffs had valid employment contracts with Defendant. While they did not list specific pay rates for performing non-agricultural work, these contracts promised that Defendant would pay Plaintiffs "the highest of the AEWR, the prevailing hourly wage or piece rate, the agreed-upon collective bargaining wage, or the Federal or State minimum wage." Fact 148. Defendant breached this provision by paying Plaintiffs the AEWR, a wage rate that applies to H-2A workers performing agricultural work, despite that Plaintiffs did not perform any such work

for Defendant, as discussed above, and despite that the AEWR was not the highest of the listed wage rates. Under their contracts, Plaintiffs were owed the Federal minimum wage due temporary foreign workers performing non-agricultural jobs, i.e., the average wage for the occupation in the geographic area, as determined through the Bureau of Labor Statistics' OEWS survey.

### 1. **The Job Orders and Applications for Temporary Employment Certifications Constitute Valid Employment Contracts Between Plaintiffs and Defendant.**

The regulations governing the H-2A program require that employers hiring temporary workers through the H-2A program must provide each H-2A worker with "a copy of the work contract." 20 C.F.R. §§ 655.122(q); 29 C.F.R. § 501.3.[7] The regulations state further that, "[i]n the absence of a separate, written work contract entered into between the employer and the worker, the required terms of the job order and the certified Application for Temporary Employment Certification **will be the work contract**."[8] *Id.* (emphasis added). Defendant admits that the job orders served as the work contracts for 17 of the Plaintiffs. Fact 141. For the remaining 14 Plaintiffs, and without any explanation for the difference in phrasing, Defendant admits that in the absence of a separate contract, "the job order and the certified Application for Temporary Employment Certification became the work contract applicable to those plaintiffs who worked pursuant to the referenced clearance orders." Fact 141. Because Defendant has not produced any separate written agreements that contain all required H-2A provisions and

[7] An H-2A contract must contain, at a minimum, all the provisions and obligations required by 8 U.S.C. § 1188, 29 C.F.R. part 501 and 20 C.F.R. § 655.122. *Id.*

[8] In the H-2A regulations, the "job order" refers to "The document containing the material terms and conditions of employment that is posted by the State Workforce Agency (SWA) on its interstate and intrastate job clearance systems based on the employer's Agricultural Clearance Order (Form ETA–790/ETA–790A and all appropriate addenda), as submitted to the NPC." 20 C.F.R. § 655.103(b). Form ETA 790A, H-2A Agricultural Clearance order, is attached to each employer's H-2A Application for Temporary Employment Certification, Form ETA 9142A, as part of the H-2A application process.

obligations, this admission can only be read as an admission that the job order and application were in fact an employment contract with the Plaintiffs. *See* Ex. I to Ex. 1, Compare Def. Resp. to Req. for Adm. Nos. 64–68 to 139–143.[9]

As prescribed by federal regulations and as admitted to by the Defendant, the job orders and Applications for Temporary Employment Certification, including the attached H-2A Agricultural Clearance Orders (Form ETA-790A), attached as Exhibits CC–GG to Ex. 1, operated as the employment contracts between Plaintiffs and Defendant. Federal courts routinely confirm that such job orders and Applications for Temporary Employment Certification are valid and enforceable contracts between H-2A workers and their employers. *See, e.g.*, *Palma Ulloa v. Fancy Farms, Inc.*, 762 Fed. Appx. 859, 863 (11th Cir. 2019); *Medina-Arreguin v. Sanchez*, 398 F. Supp.3d 1314, 1324 (S.D. Ga. 2019); *see also Salazar-Calderon v. Presidio Valley Farmers Ass'n*, 765 F.2d 1334, 1341–42 (5th Cir. 1985) (holding that the terms of employment set out in USDOL's H-2 regulations are the minimum terms H-2A employers are required to offer).

Further, the H-2A Applications and Clearance Orders also satisfy the elements required for a contract to be valid under Louisiana state law. "In Louisiana, the four elements of a valid contract are 'capacity, consent, a lawful cause, and a valid object.'" *Thomas v. Ameritas Life Ins. Corp.*, 34 F.4th 395, 401 (5th Cir. 2022) (quoting *Granger v. Christus Health C. Louisiana*, 144 So. 3d 736, 760 (La. 2013). "In other words, the parties must have the capacity to contract and give their consent freely for a certain object, and the contract must have a lawful purpose." *Leger*

[9] Plaintiffs served two sets of Requests for Admission on Defendant. Plaintiffs' First Set of Requests for Admission, Request Nos. 64–68, pertained to the 14 Plaintiffs then in this lawsuit. Plaintiffs' Second Set of Requests for Admission, Request Nos. 139-143, sought the same admission for the newly joined 17 additional Plaintiffs, but Defendant responded differently. In response to Request for Admission No. 160, Defendant admitted that "the job orders served as Plaintiffs' work contracts."

*v. Tyson Foods, Inc.*, 95–1055 (La. App. 3 Cir. 1/31/96), 670 So. 2d 397, 401. All elements are satisfied.

First, all parties had capacity to contract. *See* La. Civ. Code art. 1918 ("All persons have capacity to contract, except unemancipated minors, interdicts, and persons deprived of reason at the time of contracting."); *see also Higgins v. Spencer*, 531 So. 2d 768, 770 (La. Ct. App.) (stating that any "exceptions to the presumption of capacity must be shown quite convincingly and by the great weight of the evidence."). Here, all parties to the contracts at issue were over 18 years old, Facts 7, 37–39, and 62, and there is no evidence in the record that any party was an interdict or deprived of reason at the time of contracting.

Second, all parties consented to the contract. "A contract is formed by the consent of the parties established through offer and acceptance," and "offer and acceptance may be made orally, in writing, **or by action or inaction that under the circumstances is clearly indicative of consent**." *See* La. Civ. Code art. 1927 (emphasis added). Defendant intended that the clearance orders communicated the anticipated terms of employment to prospective employees, making assurances about the job terms that were signed under penalty of perjury. Facts 38, 40, 144, 147. Defendant and its agents used the clearance orders to advertise and recruit workers for Defendant. Facts 144–147. Plaintiffs accepted the job offers by obtaining H-2A visas for employment with Defendant, traveling from their permanent places of residence in Mexico to Defendant's worksite in Louisiana, and working for Defendant. Facts 61, 63. 65–95. "Nearly every state has determined, using precepts similar to [Louisiana's] civilian principles, that when an employer promises a benefit to employees, and employees accept by their actions in meeting the conditions, the result is not a mere gratuity or illusory promise but a vested right in the

employee to the promised benefit." *Knecht v. Bd. of Trustees for State Colleges & Universities & Nw. State Univ.*, 591 So. 2d 690, 695 (La. 1991).

Finally, the record shows that the parties consented to a valid object for lawful cause. "Parties are free to contract for any object that is lawful, possible, and determined or determinable." La. Civ. Code Ann. art. 1971. The objects of an employment contract are "giving of services in the form of labor" for "a fixed price." *Vining v. Bardwell,* 482 So.2d 685 (La.App. 1st Cir.1985). The objects of the employment contracts between Plaintiffs and the Defendant, the giving of labor in exchange for wages, are both lawful and possible. The type and amount of work performed by Plaintiffs are easily determinable and are well established by the record. Facts 65–95, 110, 127–128, 133–138; Section IV, below; Ex. 4 (Damages Table). Although the contract did not specify the wage rate to be paid for **non-agricultural** work that Plaintiffs performed, *see* Section III.A.1.c, Louisiana makes clear that

> When the parties made no provision for a particular situation, it must be assumed that they intended to bind themselves not only to the express provisions of the contract, but also to whatever the law, equity, or usage regards as implied in a contract of that kind or necessary for the contract to achieve its purpose.

La. Civ. Code Ann. art. 2054; *see also* La. Civ. Code art. 1975 ("The quantity of a contractual object may be determined by the output of one party or the requirements of the other. In such a case, output or requirements must be measured in good faith.").

Under federal regulations, state contract law, and Defendant's own admissions, the H-2A Applications and Clearance orders were valid employment contracts between Defendant and Plaintiffs.

**a. <u>Plaintiffs' employment contracts required payment of the "Federal minimum wage."</u>**

Plaintiffs' employment contracts, as embodied in the job orders, included Defendant's obligations imposed by the H-2A regulations. *Sandoval Cervantes v. Spring Meadow Nursery, Inc.*, No. 1:20-cv-1132, 2021 WL 5310914, at *2 (W.D. Mich. 2021); 20 C.F.R. § 655.135. Among other things, the job orders incorporated the regulatory requirement that Defendant pay all foreign workers the highest of four different wage rates. 20 C.F.R. §§ 655.120(a) and 655.122(l); Fact 148. In this instance, the highest of the four was the "Federal minimum wage."[10]

As used in the H-2A regulations, "Federal minimum wage" incorporates a number of different minimum wage rates required by federal statutes or regulations. The text of 20 C.F.R. § 655.120(a) in no way limits the term to the minimum wage rates established by the FLSA. USDOL deliberately adopted this language to encompass the wide range of federal wage requirements, many of which USDOL itself enforces. When in 1987 it first proposed the language now codified at § 655.120(a), USDOL emphasized that "[i]f the employment is covered under *any* federal or State minimum wage law, the employer must comply with that law," citing the FLSA minimum wage provisions and regulatory wage requirements for interstate job orders as examples. 52 Fed. Reg. 16770, 16774 (May 5, 1987) (emphasis added). Importantly, in its discussion of this new requirement, USDOL specifically referred to *Limoneira Co. v. Wirtz*, 225 F. Supp. 961, 963 (S.D. Cal. 1963), *aff'd* 327 F.2d 499 (9th Cir. 1964), which concerned the agency's establishment of "minimum wages" during the Bracero agricultural

---

[10] The other three wage rates were the agricultural AEWR, the prevailing wage, or the collective bargaining wage. 20 C.F.R. § 655.120(a). With respect to this case, the AEWR was the only available wage rate other than "Federal or State minimum wage." Defendant had not entered into any collective bargaining agreement. *Garcia v. Stewart*, 531 F.Supp.3d 194, 213 (D.D.C. 2021) (not every job has an agreed-upon collective bargaining wage). And there was no prevailing wage rate because the Louisiana state workforce agency had not surveyed wage rates for truckers hauling sugar cane. 20 C.F.R.§ 655.103(b) (defining "prevailing wage"); *Garcia*, 531 F.Supp.3d at 201, 209–10 (the majority of state workforce agencies do not conduct prevailing wage surveys and USDOL is "not obligated to establish a prevailing wage separate from the AEWR for every occupation…"

guestworker program.[11] USDOL's treatment of "Federal minimum wage" in 20 C.F.R. § 655.120(a) as a broad one, including minimum wage rates contained in many federal statutes and regulations, is consistent with the use of that term by the Executive Branch,[12] the Congress,[13] the federal courts,[14] and the USDOL itself.[15]

**b. <u>The applicable federal minimum wage under Plaintiffs' contracts was the OEWS rate for the type of work they performed</u>.**

For well over 50 years, minimum wages have been an integral part of federal "guestworker" programs. The Immigration and Nationality Act of 1952 created a single H-2 program that permitted employers to import workers from abroad to fill temporary jobs both within and outside agriculture, provided that certain conditions were met. *Bayou Lawn & Landscape Services v. Johnson*, 173 F.Supp.3d 1271, 1276 (N.D. Fla. 2016). Through regulations, USDOL was charged with evaluating employer requests to determine, *inter alia*, whether the employment of the foreign workers would adversely affect the wages of similarly employed U.S. workers. *AFL-CIO v. Brock*, 835 F.2d 912, 913 (D.C. Cir. 1987). In the regulations adopted to accomplish this objective, USDOL imposed minimum wage requirements through an hourly AEWR. *Id.*; *Salazar-Calderon*, 765 F.2d at 1338 (the H-2 regulations establish minimum job terms, including "a special wage known as the adverse effect wage rate," "[t]o

[11] At the time *Limoneira* was decided, agricultural workers were not even covered by the FLSA. *Buero v. Amazon.Com Services, Inc.*, 61 F.4th 1031, 1038 (9th Cir. 2023) (FLSA coverage was first extended to farmworkers in 1966).

[12] Executive Order 14026, April 27, 2021, entitled "Increasing the Minimum Wage for Federal Contractors."

[13] 40 U.S.C. § 3142(a) (referring to "minimum wages" to be paid laborers and mechanics under the Davis-Bacon Act).

[14] *See, e.g., Cuellar-Aguilar v. Deggeller Attractions, Inc.*, 812 F.3d 614, 620 (8th Cir. 2015) (obligation to pay workers at least the OEWS prevailing wage is imposed on H-2B workers "[l]ike a minimum-wage law"), and *Louisiana Forestry Association v. Solis,* 889 F.Supp.2d 711, 715 (E.D. Pa. 2012), *aff'd sub nom. Louisiana Forestry Association, Inc. v. Secretary, U.S. Department of Labor*, 745 F.3d 653 (3d Cir. 2014) (describing the OEWS wage as the minimum wage that an employer must pay in order to participate in the H-2B program.)

[15] 86 Fed. Reg. 62126, "Increasing the Minimum Wage for Federal Contractors."

ensure that the employment of aliens under H–2 will not adversely affect the working conditions of similarly employed U.S. workers."); *Shoreham Cooperative Apple Producers, Inc. v. Donovan*, 764 F.2d 135, 137 (2d Cir. 1985) (the AEWR is "the hourly minimum wage to be paid to both foreign and domestic employees.") Then, as now, payment of the AEWR ensured that the employment of foreign workers did not depress the wages of similarly employed domestic agricultural workers. *Production Farm Management v. Brock*, 767 F.2d 1368, 1369 (9th Cir. 1985); *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 596 (1982) ("The obvious point" of the regulations is to assure that to the extent foreign workers are employed, the wages of domestic workers are not to be adversely affected); *Florida Sugar Cane League, Inc. v. Usery*, 531 F.2d 299, 301 (5th Cir. 1976).

As part of the Immigration Reform and Control Act of 1986, Congress divided the former H-2 program into two separate components: the H–2A program for agricultural workers and the H–2B program for non-agricultural workers. *Bayou Lawn & Landscape Services*, 173 F. Supp. 3d at 1276. Both programs continued to use regulatorily-established minimum wages to avoid depression of the earnings of U.S. workers. For agricultural workers, the AEWR remained the minimum wage. *AFL-CIO*, 923 F.2d at 184; *Arriaga v. Florida Pacific Farms, LLC* 305 F3d 1228, 1233 (11th Cir. 2002) (the AEWR is the "minimum wage" that must be paid by all H-2A employers); *Tijerina-Salazar v. Venegas*, No. PE:19-cv-74, 2022 WL 1927007, at *5 (W.D. Tex. June 3, 2022); *Perez-Benites v. Candy Brand, LLC*, No. 1:07-cv-1048, 2011 WL 1978414, at *6 (W.D. Ark. May 20, 2011); *Espinoza v. West Coast Tomato Growers, LLC*, No. 14-CV-2984, 2016 WL 4468175, at *3 (S.D. Cal. Aug. 24, 2016); *Hernandez v. Siri & Son Farms, Inc.*, No. 6:20-cv-669, 2021 WL 4999022, at *1, n.1 (D. Ore. Sep. 20, 2021).

The minimum wage for temporary workers employed through the H-2B program is the arithmetic mean of the OEWS prevailing wage[16] as calculated by the Bureau of Labor Statistics.[17] 20 C.F.R. § 655.10(b); *Louisiana Forestry Ass'n, Inc. v. Sec. of Labor*, 745 F.3d 653, 661-62 (3d Cir. 2014). And, as with the AEWR for agricultural workers, "[t]he purpose of the prevailing wage requirement is to prevent foreign workers from adversely affecting American workers seeking to perform the same work." *Cuellar-Aguilar v. Deggeller Attractions, Inc.*, 812 F.3d 614, 617 (8th Cir. 2015)

In their employment contracts, Defendant promised to pay Plaintiffs the "Federal minimum wage" if it was higher than the agricultural AEWR. For workers such as Plaintiffs, who were employed in non-agricultural tasks, the applicable federal minimum wage was the regulatorily required one for guestworkers employed in temporary non-agricultural jobs, codified at 20 C.F.R. § 655.10(b). And, in fact, this federal minimum wage was higher than the AEWR. For example, in St. Mary Parish, the OEWS wages applicable to H-2B workers driving heavy trucks were $18.46 per hour for the period from July 2018 to June 2019; $19.52 per hour for the period from July 2019 to June 2020; $20.33 per hour for the period from July 2020 to June 2021; and $19.76 per hour for the period from July 2021 to June 2022.[18]

Besides being required by the terms of Plaintiffs' employment contracts, payment of the OEWS wage is consistent with USDOL's own enforcement policies. In an April 2022 Field Assistance Bulletin to the agency's enforcement staff, USDOL's acting wage administrator addressed situations in which employers require H-2B employees to work in job classifications

---

[16] This H-2B "prevailing wage" is separate and distinct from the "prevailing wage" referenced in 29 C.F.R. § 655.103, and discussed in footnote 10, supra.

[17] Prior to 2021, the reported data were referred to as the "OES" survey. The data began being referred to as the "OEWS" survey. *See* https://www.bls.gov/opub/hom/oews/history.htm

[18] By comparison, during those same years, the Louisiana AEWR ranged from a low of $10.73 per hour in 2018 to a high of $12.45 in 2022. Facts 103–108.

not disclosed in the H-2B certification process, almost always coupled with a failure to pay the worker the OEWS wage for the occupation actually performed. Ex. 5 hereto, Field Assistance Bulletin 2022-3 (Apr. 13, 2022). By doing so, the employer fails to comply with 20 C.F.R. § 655.20(a)(1), the H-2B counterpart of 20 C.F.R. § 655.120(a), contained in Plaintiffs' employment contracts. *Id.*, at 5;[19] *see also* Ex. 6 hereto, *In re Global Horizons, Inc.*, Case No. 2010-TAE-00002 (USDOL Office of Administrative Law Judges), Order of Dec. 17, 2010, at 12 (H-2A employer failed to pay the Federal minimum wage when it compensated its camp cooks, mechanics and shuttle drivers at the lower AEWR for field laborers.)[20] When H-2B workers are certified for jobs with lower prevailing wages than the work they actually end up performing, USDOL identifies the highest applicable wage under the SOC code applicable to the job duties performed and calculates back wages owed on that higher wage. *See* Ex. 5, Field Assistance Bulletin 2022-3 p. 7-8 (Apr. 13, 2022).

Federal courts have reached similar results in other cases in which workers have been misclassified and paid a wage rate less than that required for the occupation actually performed. For example, in *Saenz Mencia v. Allred*, 808 F.3d 463 (10th Cir. 2015), the plaintiff H-2A worker had been admitted through the H-2A process as a sheepherder. The H-2A regulations contain special procedures, allowing sheepherders to be paid a relatively low monthly wage, as opposed to the hourly AEWR generally due H-2A workers. 808 F.3d at 466. The appeals court concluded that the worker was not primarily employed as a sheepherder, and instead performed duties properly categorized as those of a ranch hand. *Id.* at 468. This rendered the contractual

[19] Like the obligation imposed on Defendant and other H-2A employers by 20 C.F.R. § 655.120(a), 20 C.F.R. § 655.20(a)(1) requires H-2B employers to pay the highest of several minimum wages, including the "Federal minimum wage."

[20] The administrative law judge's ruling is the final administrative decision of the Secretary of Labor. 29 C.F.R. § 18.58.

wage term of $750 per month for sheepherding work as "illegal and the wage term of the contract was accordingly invalid." *Id.* at 472. As a result, the employer was obligated to compensate the H-2A worker at the rate for the job he actually performed (ranch hand), rather than the job for which he received his H-2A visa (sheepherder). *Id.* at 473. In this case, as in *Saenz Mencia*, Plaintiffs were required to be paid at the prevailing wage for the non-agricultural tasks they actually performed, rather than the AEWR applicable to agricultural jobs.

**c. Interpreting the contract to only guarantee the AEWR would be unlawful and contrary to public policy for the non-agricultural work performed by Plaintiffs.**

"[A]n employer and employee may negotiate the terms of an employment contract and agree to any terms not prohibited by law or public policy." *Preis, PLC v. Daily*, 2019-700 (La. App. 3 Cir. 3/25/20), 297 So. 3d 853, 859 (finding stipulated damages term in employment contract void and unenforceable because La.R.S. 23:634(A) prohibits employers from requiring employees to forfeit their wages in the event of their resignation). "[I]f there are legal or strong public policy considerations justifying the refusal to honor the contract as written, then the contractual stipulations are disregarded." *Tech. Indus., Inc. v. Banks*, 419 F. Supp. 2d 903, 908 (W.D. La. 2006) (nullifying choice of law term in contract as against Louisiana law and also discussing Louisiana public policy against noncompetition agreements). In such a circumstance, where the price or payment term of an otherwise valid contract is void or omitted, the court can supply a reasonable price. *Tallulah Const., Inc. v. Ne. Louisiana Delta Cmty. Dev. Corp.*, 2007-1029 (La. App. 4 Cir. 4/23/08), 982 So. 2d 225, 233 ("Because a valid contract existed between the parties, but no agreement as to price, equity principles mandate that [Plaintiff] receive compensation for a reasonable value of goods and/or services rendered.").

As described above, Congress designed the H-2A program to allow admission of foreign workers to perform *agricultural* labor or services of a seasonal or temporary nature only if (1) there are "not sufficient able, willing, and qualified United States (U.S.) workers available to perform the agricultural labor or services of a temporary or seasonal nature for which an employer desires to hire temporary foreign workers," and (2) the employment of foreign workers will not adversely affect the wages and working conditions of similarly employed U.S. workers. 20 C.F.R. §§ 655.100, 655.0(a), and 655.103(a); 8 U.S.C. §§ 1101(a)(15)(H)(ii)(a) and 1188(a)(1).[21] To carry out these public purposes, the Office of Foreign Labor Certification Administrator annually publishes the AEWR, which is the minimum wage rate applicable to H-2A workers to ensure that the wages paid to foreign agricultural workers do not undercut and adversely affect the wages of local agricultural workers. Section III.A.1.b.; *see e.g.*, *Salazar-Calderon*, 765 F.2d at 1338 (5th Cir. 1985); *Alfaro-Huitron v. Cervantes Agribusiness*, 982 F.3d 1242, 1247 (10th Cir. 2020); *N.C. Growers' Ass'n, Inc. v. United Farm Workers*, 702 F.3d 755, 759 (4th Cir. 2012); 20 C.F.R. §§ 655.103(b) 655.120(b). The AEWR rates Defendant paid during the relevant period were calculated annually by state or region using wage data of *field and livestock workers* obtained through the U.S. Department of Agriculture's (USDA) Farm Labor Survey (FLS), collected by USDA's National Agricultural Statistics Service (NASS). 75 Fed. Reg. 6884 (Feb. 12, 2010), *Temporary Agricultural Employment of H-2A Aliens in the United States, Final Rule*); 88 FR 12760-01 (Feb. 28, 2023), *Adverse Effect Wage Rate*

[21] The federal H-2B program applicable to the hiring of temporary foreign workers in *non-agricultural* work similarly requires that "(1) There are not sufficient U.S. workers who are qualified and who will be available to perform the temporary services or labor for which an employer desires to hire foreign workers, and that (2) The employment of the H-2B worker(s) will not adversely affect the wages and working conditions of U.S. workers similarly employed." 20 C.F.R. § 655.1(a).

*Methodology for the Temporary Employment of H-2A Nonimmigrants in Non-Range Occupations in the United States*.

Misclassifying workers in occupations with lower applicable wages causes exactly the adverse effect Congress intended to prevent. As USDOL explained in instances of misclassification within the H-2B program:

> "Further, H-2B workers who are employed in a job classification not listed on the TEC Application (Form ETA-9142B) may be paid wage rates that are significantly less than the prevailing wage for the job being performed, which can result in two distinct harms: (1) workers with H-2B visas (H-2B workers) are paid less than the prevailing wage for the job they are actually performing; and (2) other workers performing the same work as the underpaid H-2B workers have their wages undercut by the employer's noncompliance with the H-2B provisions of the Immigration and Nationality Act (H-2B visa program)."

Ex. 5, Field Assistance Bulletin 2022-3, p. 1 (Apr. 13, 2022). Misclassification also harms U.S. workers' ability to be adequately notified of job opportunities. As under the H-2B program, H-2A employers are required to recruit U.S. workers by advertising the job order with sufficient detail. 20 C.F.R. §§ 655.153-156 and 655.40–46. "If the employer has not accurately disclosed the job duties, classification, and prevailing wage for these positions, it has not accurately tested the labor market for qualified, available U.S. applicants, because potential U.S. applicants are unaware of the true nature of the job opportunity and its corresponding prevailing wage." Ex. 5, Field Assistance Bulletin, 2022-3, p. 6.

The specified "hourly wage" in Defendant's clearance orders is the AEWR in place for each season. Fact 143. As outlined above, the AEWR is a federally governed wage rate that operates in the H-2A program for *agricultural* labor. Plaintiffs, however, were not employed in agriculture and the employment contracts do not specify a rate for non-agricultural work. To the extent Defendant believes it only offered to pay the AEWR, that is an illegal wage term. *See Mencia v. Allred*, 808 F.3d 463, 472 (10th Cir. 2015) (where H-2A worker performed work

different than was disclosed in H-2A application and clearance order, H-2A employer's contractual wage term of $750 per month for sheepherding work was "illegal and the wage term of the contract was accordingly invalid," and the Court must substitute a reasonable price, which "must be at least as high as the lowest wage" the H-2A worker could lawfully be paid for the work actually performed as a ranch hand); 29 C.F.R. § 501.20(d)(vii) (employing H-2A workers in activities not listed in the job order is considered a violation of the H-2A program). Furthermore, the H-2A regulations prohibit employers from even asking workers to waive their rights. 29 C.F.R. § 501.5 ("A person may not seek to have an H-2A worker . . . waive any rights conferred under 8 U.S.C. 1188, 20 CFR part 655, subpart B, or this part. Any agreement by a worker purporting to waive or modify any rights given to said person under 8 U.S.C. 1188, 20 CFR part 655, subpart B, or this part shall be void as contrary to public policy.").

A contract term that would allow Defendant to pay the much lower AEWR rate by misclassifying Plaintiffs' work as agricultural when it was not contravenes the H-2 programs' primary purpose of ensuring that the wages paid to Plaintiffs for their work, here driving heavy trucks or engaging in other non-agricultural tasks, "will not adversely affect the wages and working conditions of workers in the United States similarly employed." 20 C.F.R. §§ 655.100(a)(1)(ii). The only way to effectuate Congress's intent in the H-2 programs is to pay Plaintiffs the OEWS prevailing wage rates applicable to non-agricultural H-2B workers ("the arithmetic mean of the wages of workers similarly employed") based on the type of work Plaintiffs performed, *see* 20 C.F.R. § 655.10(b)(2), whether analyzing their claims as breach of

contract or under a theory of unjust enrichment.[22] As explained in Section III.B., below, the OEWS wage rates are the best and most accurate measure of the fair value of Plaintiffs' labor.

**2. <u>By Paying Plaintiffs the AEWR Instead of the Higher OEWS Prevailing Wage Rate Applicable to Their Non-Agricultural Work Performed, Defendant Breached Its Employment Contracts with Plaintiffs.</u>**

It is undisputed that the employment contracts between Plaintiffs and the Defendant required Plaintiffs to be paid the *highest* of four different wage rates. Facts 141, 148. As explained above, the highest of these rates was the OEWS prevailing wage, which is the federal minimum wage applicable to H-2 workers performing *non-agricultural* work. It is undisputed that Defendant paid Plaintiffs at the hourly AEWR for each workweek in which they were employed. Fact 103. It is undisputed that for the years at issue, the H-2B OEWS prevailing wage rate was higher than the AEWR. Facts 104–108, 117–126. Because Plaintiffs' work was not agricultural, *see* Section I, the OEWS prevailing wage rates are highest minimum wage required by federal law and the best measure of the value of Plaintiffs' labor. By failing to pay Plaintiffs the OEWS prevailing wage rate, Defendant breached its employment contracts with them.

**B. <u>Plaintiffs Are Entitled to the OEWS Prevailing Wage Rate Based on a Theory of Unjust Enrichment.</u>**

Plaintiffs also bring claims against Defendant on a theory of unjust enrichment. Louisiana civil code states that

> A person who has been enriched without cause at the expense of another person is bound to compensate that person. The term "without cause" is used in this context

[22] The fact that USDOL approved the H-2A job order, which included the annual AEWR rates, is immaterial because Defendant's description of the work to be performed by Plaintiffs misrepresented the nature of the work to be performed, leading USDOL to believe that the work was agricultural when it was not. Furthermore, when a State Workforce Agency puts an H-2 clearance order into interstate commerce to advertise the job, it must contain the language "neither the ETA nor the SWAs are guarantors of the accuracy or truthfulness of information contained on job orders submitted by employers. Nor does any job order accepted or recruited upon by the ES constitute a contractual job offer to which the ETA or a SWA is in any way a party." 20 CFR § 653.501(c)(1)(i). Thus, it is the employer who is ultimately responsible for providing complete, truthful, and accurate information in its H-2A applications and clearance orders and for complying with applicable laws.

> to exclude cases in which the enrichment results from a valid juridical act or the law. The remedy declared here is subsidiary and shall not be available if the law provides another remedy for the impoverishment or declares a contrary rule. The amount of compensation due is measured by the extent to which one has been enriched or the other has been impoverished, whichever is less. The extent of the enrichment or impoverishment is measured as of the time the suit is brought or, according to the circumstances, as of the time the judgment is rendered.

La. Civ. Code art. 2298. The requisite elements of a claim for unjust enrichment are: (1) an enrichment; (2) an impoverishment; (3) a connection between the enrichment and the impoverishment; (4) an absence of justification or cause for the enrichment and impoverishment; and (5) no other remedy at law. *Baker v. Maclay Props. Co*., 648 So.2d 888 (La. 1995).

As already described above, Defendant was enriched, and Plaintiffs were correspondingly impoverished, by Defendant paying Plaintiffs the lower agricultural AEWR applicable to agricultural workers instead of the higher OEWS prevailing wage rate by occupational code for non-agricultural work they actually performed. There is a direct connection between the financial enrichment of Defendant in paying wages lower than the going rate for heavy truck drivers, light truck drivers, and mechanics in the area in Louisiana and Plaintiffs' impoverishment by being denied payment for the actual value of the skilled, non-agricultural labor that they performed. There is no justification for Defendant having misrepresented the description of the work to be performed in their H-2A applications to USDOL. Defendant abused the H-2A process to secure skilled labor demanding higher wages at a much lower agricultural AEWR, harming Plaintiffs, U.S. workers, other employers who followed the law or who do not participate in the H-2A program. There can be no legitimate justification for a practice that violates the explicit public policy mandates of the H-2 visa programs and that relied on Defendant's fraudulent applications. If the Court determines that there was no contract, *see* Section III.A. above, then there is no other remedy at law to correctly compensate Plaintiffs for the value of the work performed.

Besides being the mandatory rate to be paid temporary foreign workers imported to perform non-agricultural H-2B jobs, the OEWS wage rates represent the best and most accurate measure of the fair value of Plaintiffs' labor because it is the most accurate labor survey available of the wage rate paid to similarly situated workers for the same type of work and in the same geographic area. Through the OEWS surveys, the U.S. Bureau of Labor Statistics ("BLS") produces employment and wage statistics for over 800 occupations for the nation as a whole and for individual metropolitan and nonmetropolitan areas. *See* Ex. 7 hereto, (BLS, USDOL, OEWS, Frequently Asked Questions, "What does the OEWS program produce?" https://www.bls.gov/oes/oes_ques.htm). BLS works cooperatively with State Workforce Agencies (SWAs) to contact approximately 180,000 to 185,000 sampled establishments twice annually. *See* Ex. 8 (BLS, USDOL, OEWS, Handbook of Methods, Data Sources, https://www.bls.gov/opub/hom/oews/data.htm). Each semiannual sample is used in conjunction with the previous five semiannual samples (i.e. over a three-year period) to create a combined sample of approximately 1.1 million establishments, and yielding a 69% response rate over that period, or about 57% of employment in the U.S. *See* Ex. 7 (BLS, USDOL, OEWS, Frequently Asked Questions, Why does the OEWS program produce estimates from more than one year's data?); Ex. 9 (BLS, USDOL, OEWS, Handbook of Methods, Calculation https://www.bls.gov/opub/hom/oews/calculation.htm). Other than the Decennial Census, the wage component of the OEWS survey is regarded as the most comprehensive survey conducted by any agency of the federal government. 73 Fed. Reg. 8550 (Feb. 13, 2008). The OEWS uses the "2018 Standard Occupational Classification (SOC) system" which is a federal statistical standard through which "[a]ll workers are classified into one of 867 detailed occupations according to their occupational definition." Ex. 10 (BLS, USDOL, OEWS, Standard

Occupational Classification Home, https://www.bls.gov/soc/). The SOC codes applicable to Plaintiffs' work are SOC 53-3032 for heavy truck drivers (trucks weighing 26,000 pounds or more) and 53-3033 for light truck drivers. Ex. 11, (BLS, USDOL, OEWS, Standard Occupational Classification, About, 2018 SOC System, https://www.bls.gov/soc/2018/major_groups.htm). The OEWS code for truck mechanics is SOC 49-3031. *Id.* (illustrative examples include tractor trailer mechanics).

### C. **Defendant Owes Plaintiffs Their Unpaid Wages Under the Louisiana Wage Payment Act.**

The Louisiana Wage Payment Act, Louisiana Revised Statutes 23:631 and 23:632 ("LWPA"), requires employers to pay their employees any unpaid wages due by the employee's next regular payday and not later than 15 days after employment ends. It is undisputed that Defendant is Plaintiffs' employer, *see* above Section II.A., and that more than 15 days have passed since each Plaintiff's fixed term of employment pursuant to their H-2A contracts for each season has ended. *See* Facts 65–95; Ex. 4 (Damages Table). To the extent the Court determines that Plaintiffs are owed unpaid wages pursuant to the terms of their employment, as briefed above, Defendant is also liable to Plaintiffs under the LWPA for failing to pay these wages due within 15 days of their employment ending.

## IV. Plaintiffs Are Owed Their Unpaid Overtime and Regular Wages at the OEWS Prevailing Wage Rate, Liquidated Damages, and Reasonable Attorney's Fees.

Because Plaintiffs have proven that there is no genuine issue of material fact regarding Defendant's liability under the FLSA, LWPA, and for breach of contract or unjust enrichment,

Plaintiffs are entitled to damages, including unpaid wages for four years, liquidated damages for three years, and attorney's fees, as shown in Exhibit 4 (Damages Table).[23]

### A. Plaintiffs Are Owed Unpaid Wages for All Years Employed by Defendant.

The table attached as Exhibit 4 (Damages Table) summarizes the information contained in Defendant's payroll records and calculates Plaintiffs' unpaid wages under the FLSA, LWPA, and contract or unjust enrichment claims according to the nature of the work Plaintiffs actually performed. Plaintiffs input the hours worked and amounts paid for each Plaintiff from Defendants' payroll records and time card reports,[24] *see* Ex. 12 (Farias Decl.), and calculated the wages, including overtime wages, that should have been paid at the OEWS prevailing wage rates[25] for heavy truck drivers, light truck drivers, and mechanics,[26] *see* Ex. 2 (Bucheri Decl.).

---

[23] Defendant's former employees Valentin Valenzuela Flores and Jesus Adulfo Lopez Osuna have passed away since they completed their employment for Defendant, and are represented in this lawsuit by their surviving spouses, Teresa de Jesus Sanchez Gonzalez and Margarita Valenzuela Urias, respectively. Doc. 66 ¶¶ 101, 102, 174 ,187, 192, 200. Pursuant to La. Stat. Ann. § 9:1515, if the Court determines that Defendant owes workers Valenzuela Flores and Lopez Osuna unpaid wages, then the unpaid wage amounts owed may be paid to their surviving spouses. During the discovery process in this case, representatives and surviving spouses Teresa de Jesus Sanchez Gonzalez and Margarita Valenzuela Urias have each provided Defendant with copies of their husbands' death certificates and marriage licenses to their husbands, pursuant to La. Stat. Ann. § 9:1515. Facts 139–140.

[24] As described in Ex. 12, Farias Declaration, and Ex. 2, Bucheri Declaration, Defendant's pay-related documents included Check and Payroll Registers and Time Card Reports (in PDF copy and excel format conversions) for the 31 Plaintiffs. In the interest of judicial economy and to avoid burdening the Court, Plaintiffs have not attached as exhibits all of Defendant's underlying payroll records, which exceed 1,000 pages, that form the basis of Plaintiffs' Damages Table (Ex. 4). Instead, Plaintiffs have attached a sample of Defendant's payroll records for one Plaintiff, attached as Ex. LL to Ex. 1 (Statement of Undisputed Material Facts), so that the Court can view the format of the underlying payroll records from which the data was taken and better understand the methodology used to calculate damages. At the Court's request, Plaintiffs can provide the complete and voluminous full record of payroll records produced by Defendant in this case and from which the Damages Table pay and hours data was collected.

[25] *See* Sections II.B. and III., above, for an explanation of why the OEWS prevailing wage is the "regular rate" for FLSA purposes and the contractually guaranteed hourly wage rate.

[26] For St. Mary Parish, where Defendant is located, during the years applicable to this lawsuit, the OEWS wages applicable to H-2B workers driving heavy trucks were $18.46 per hour for the period from July 2018 to June 2019; $19.52 per hour for the period from July 2019 to June 2020; $20.33 per hour for the period from July 2020 to June 2021; and $19.76 per hour for the period from July 2021 to June 2022. Facts 117–120. Apart from driving heavy trucks on public roads, Plaintiff Jesus A. Parra Martinez, was employed to transport sugarcane within the Sterling Sugars mill operating a lighter truck. Fact 137.

The amounts owed in each workweek are calculated by subtracting the amounts Plaintiffs were actually paid by Defendant from the amounts they should have been paid under the FLSA, LWPA, and their employment contracts (or due to Defendant's unjust enrichment) at the applicable OEWS wage rate and with overtime wages paid for hours worked over 40 in a workweek ((applicable OEWS wage rate x total hours worked) + ((1.5 x OEWS rate x (total hours – 40)) = amount that should have been paid).[27]

In calculating the amount of overtime owed under the FLSA, Plaintiffs are entitled to include in their damages the unpaid prevailing wage rates for their regular, non-overtime, hours (i.e. for hours below 40). *See* 29 C.F.R. § 778.315 ("compensation for the excess hours of overtime work under the Act cannot be said to have been paid to an employee unless all the straight time compensation due him for the nonovertime hours under his contract (express or

---

Several Plaintiffs were employed for only a few weeks or months to do similar work operating vehicles within the mill for shorter periods of employment. Fact 138. The OEWS wages applicable to H-2B workers driving light trucks were $18.26 per hour for work performed between July 2018 and June 2019, $15.15 per hour for work performed between July 2019 and June 2020, $14.47 per hour for work performed between July 2020 and June 2021, and $15.54 per hour for work performed between July 2021 and June 2022. Facts 121–124. In one season, 2021, Plaintiffs Jesus Antonio Rodriguez Penuelas and Pedro Daniel Romero Ruelas were employed as mechanics, who were employed at the mill to maintain the vehicles utilized in the sugar processing mill and that transported the sugarcane from farms to the mill. Facts 52, 58, 136. The OEWS wage applicable to mechanics was $19.46 per hour for work performed between July 2020 and June 2021, and $19.62 per hour for work performed between July 2021 and June 2022. Facts 125–126. Pursuant to Fed. R. Evid. 201, the Court may take judicial notice of the OEWS wage rates in effect over the stated periods, attached as Ex. BB to Plaintiffs' Statement of Undisputed Material Facts, because the wage rates are calculated by the U.S. Bureau of Labor Statistics and made publicly available through the Foreign Labor Certification Data Center, which is developed and maintained by the State of Utah under contract with the US Department of Labor, Office of Foreign Labor Certification. *See* https://www.flcdatacenter.com/.

[27] Back wages are routinely computed using the regulatory program's required wage rate in cases in which a worker's occupation has been misclassified, with damages consisting of wages due the worker at the rate for the proper occupational classification, less the amount already paid. *See, e.g., Richlin Sec. Serv. Co. v. Chertoff*, 553 U.S. 571, 573–74 (2008) (misclassification under the Services Contract Act); *U.S. ex rel. International Brotherhood of Electrical Workers v. Farfield Co*., No. 09-4230, 2019 WL 7844585, at *24 (E.D. Pa., Nov. 29, 2019) (misclassification under the Davis-Bacon Act); *Foundation for Fair Contracting, Inc. v. G & M Eastern Contracting & Double E, LLC*, 259 F. Supp. 2d 329, 337 (D.N.J. 2003) (same).

implied) or under any applicable statute has been paid."); *Conner v. Cleveland County, N. Carolina*, 22 F.4th 412, 422 (4th Cir. 2022) (holding that a "gap time" claim, a claim for back pay for underpaid straight time hours in a workweek in which the employee works overtime, is cognizable under the FLSA).

### B. Plaintiffs are Entitled to Liquidated Damages for the FLSA Three-Year Willful Period.

Plaintiffs are entitled to liquidated damages and the three-year statute of limitations for willful violations under the FLSA because Defendant's failure to pay overtime was not in good faith and was willful. *See* 29 U.S.C. §§ 255, 259, 260. Defendant has alleged two defenses that correspond to the FLSA's good faith defenses: its 28th Affirmative Defense[28] corresponds to the language in 29 U.S.C. § 259, and its 29th Affirmative Defense[29] corresponds to 29 U.S.C. § 260. The employer "faces a 'substantial burden' of demonstrating good faith and a reasonable belief that its actions did not violate the FLSA" to avoid liquidated damages under 29 U.S.C. § 260. *Bernard v. IBP, Inc. of Neb.*, 154 F.3d 259, 267 (5th Cir. 1998) (quoting *Mireles v. Frio Foods, Inc.*, 899 F.2d 1407, 1415 (5th Cir.1990)); *accord Singer v. City of Waco*, 324 F.3d 813, 822–23 (5th Cir. 2003). The employer also carries the burden of pleading and proving each element of "the good faith" defense under 29 U.S.C. § 259. *See* 29 C.F.R. § 790.13. As to willfulness, the "plaintiff bears the burden of demonstrating willfulness" under 29 U.S.C. § 255, *Zannikos v. Oil Inspections (U.S.A.), Inc.*, 605 F. App'x 349, 360 (5th Cir. 2015), notwithstanding Defendant's gratuitous and erroneous raising of two supposed willfulness "defenses."[30]

---

[28] *Compare* Doc. 81, Answer at 43, *with* 29 U.S.C. § 259.
[29] *Compare* Doc. 81, Answer at 43, *with* 29 U.S.C. § 260.
[30] *Compare* Doc. 81, Answer at 43 (26th and 30th defenses), *with* 29 U.S.C. § 255.

**1. Defendant Fails to Establish Its Defense Under 29 U.S.C. § 259.**

The "good faith" defense under 29 U.S.C. § 259 provides a complete defense to FLSA liability in narrow circumstances. *See* 29 C.F.R. §§ 790.13–.19. To succeed on its 28th defense and bar Plaintiffs' FLSA claims, Defendant must establish *all* of the following: (1) that its actions were in actual conformity with "any written administrative regulation, order, ruling, approval, or interpretation [of the Department of Labor's Wage and Hour Administrator] or any administrative practice or enforcement policy [of the Administrator]" with respect to the class of employers to which Defendant belongs; (2) that its actions were taken in reliance on that ruling or policy; and (3) that it acted in good faith. 29 U.S.C. § 259; 29 C.F.R. §§ 790.13(a), 790.14, 790.16. The regulation, order, ruling, approval, interpretation, practice, or enforcement policy relied on must come from the *Administrator of the Wage and Hour Division*, who is exclusively "vested with final authority under the statutes involved," and not merely from "an individual officer or employee of an agency." *See* 29 C.F.R. §§ 790.13, 790.19; 29 C.F.R. § 259(b); *see also Nat'l Automatic Laundry & Cleaning Council v. Shultz*, 443 F.2d 689, 700 (D.C. Cir. 1971); *Hodgson v. SquareD Co.*, 459 F.2d 805, 811 (6th Cir. 1972).

Defendant here failed to produce any evidence that it relied on any regulation, order, ruling, approval, interpretation, practice, or enforcement policy from the Administrator of the Wage and Hour Division. Fact 175. Instead, Defendant's only stated basis for this defense is that it relied on the fact that its H-2A applications and clearance orders seeking foreign agricultural workers were approved.[31] *Id.* H-2A applications and job orders, however, are approved by a

[31] At the time that Defendant was deposed, its Answer to Plaintiffs' Second Amended Complaint, Doc. 81, had not yet been filed, and the defenses in effect at the time were contained in its Answer to Plaintiffs' First Amended Complaint, Doc. 29. Defendant's defense under 29 U.S.C. § 259 was numbered as its Twenty-Seventh Affirmative Defense at the time Defendant was deposed, and the same defense was later numbered as its Twenty-Eighth Affirmative Defense in its most recent Answer, Doc. 81.

"Certifying Officer" ("CO") within the Office of Foreign Labor Certification ("OFLC") of the Employment and Training Administration ("ETA") of USDOL, not by the completely separate Wage and Hour Division ("WHD"). *See* 29 C.F.R. §§ 655.101, .103(b).[32] The ETA has no final authority on wage and hours laws. The CO's approval of H-2A applications is based on the representations made by the employer under penalty of perjury in the job order about the advertised job terms.[33] The CO does not monitor or evaluate whether the employer subsequently complies with the promised job terms, nor are they tasked with doing so. It is WHD, not ETA, that is tasked with enforcing wage and hour laws and issuing related regulations or other policy decisions. Thus, Defendant's stated reliance on its H-2A applications being approved by a CO does not satisfy its burden of proof for the strict requirements of Section 259, that it must have relied on an actual regulation, order, ruling, approval, interpretation, practice, or enforcement policy *from the Administrator of the Wage and Hour Division*, with vested final authority to issue such guidance. Thus, Defendant's 28th Defense fails.

### 2. <u>Defendant Has Failed to Show Evidence of Good Faith Necessary to Avoid Liquidated Damages under 29 U.S.C. § 260.</u>

Plaintiffs are entitled to their unpaid overtime wages and "an additional equal amount as liquidated damages" pursuant to 29 U.S.C. § 216(b)[34] unless Defendant carries its burden by "plain and substantial" evidence of its subjective good faith or innocent frame of mind,

[32] See the definitions of Certifying Officer, Employment and Training Administration, Office of Foreign Labor Certification, and Wage and Hour Division.

[33] Jobs entered into the interstate clearance system, including H-2A job orders, are also reviewed by the state workforce agency ("SWA"). The SWA must ensure that the clearance order contains a disclaimer that "neither the ETA nor the SWAs are guarantors of the accuracy or truthfulness of information contained on job orders submitted by employers." 20 C.F.R. § 653.501(c)(1)(i).

[34] There is a strong presumption in favor of awarding liquidated damages, *Walton v. United Consumers Club*, 786 F.2d 303, 310 (7th Cir. 1986), because they "constitute[ ] compensation for the retention of a workman's pay which might result in damages too obscure and difficult of proof for estimate other than by liquidated damages." *Brooklyn Sav. Bank*, 324 U.S. 697, 707 (1945).

*Barcellona v. Tiffany English Pub, Inc.*, 597 F.2d 464, 468 (5th Cir. 1979), and the "objective reasonableness" of its conduct. *Solis v. Hoogland's Nursery, LLC*, 372 F. App'x 528, 530 (5th Cir. 2010). This burden "is a difficult one to meet," *Brock v. Wilamowsky*, 833 F.2d 11, 19 (2d Cir. 1987), and "[l]iquidated damages are awarded as a matter of course" for overtime violations, *Solis*, 372 F. App's at 530; *see also King v. Univ. Healthcare Sys., L.C.*, 645 F.3d 713, 725–26 (5th Cir. 2011) (liquidated damages are mandatory under 29 U.S.C. § 216(b) unless the employer can meet its burden of showing it acted in "good faith."). Even if an employer meets its burden and establishes that it acted in good faith and had reasonable grounds for believing its actions were not a violation of the FLSA, the court still retains its discretion to award liquidated damages. 20 U.S.C. § 260; *accord, e.g.*, *Dacar v. Saybolt, LP*, 914 F.3d 917, 931 (5th Cir. 2018). Good faith requires the employer to investigate potential liability under the FLSA. *Steele v. Leasing Enters., Ltd.*, 826 F.3d 237, 246 (5th Cir. 2016). Ignorance cannot be the basis for reasonable belief. *Id.*; *accord Barcellona*, 597 F.2d at 468–69; *see also Roy v Cty. of Lexington*, 141 F.3d 533, 548–49 (4th Cir. 1998) (holding that "an employer may not take an 'ostrichlike' approach to the FLSA by "simply remain[ing] blissfully ignorant of FLSA requirements") (citation and internal quotation marks omitted). When an employer produces no or insufficient evidence to meet its substantial burden of proving its good faith and reasonableness, an award of liquidated damages is proper. *See Mireles*, 899 F.2d at 1415–16.

Here, the record indicates Defendant was aware of the FLSA and its overtime requirements. Facts 53, 59, 112-116, 155–157. Defendant's parent company, Sterling Sugars, LLC, whose officers and managers were the same as those of Defendant, had always paid overtime to all of its workers, including to its mechanics and non-agricultural H-2B workers. Facts 53, 59, 112–114, 155. Randall Romero, Defendant's CEO, was aware overtime is owed to

workers in a "factory environment." Facts 5, 6, 156. Prior to 2018, when Defendant first entered the H-2A program, it paid overtime to employees who performed the *exact* same job as Plaintiffs, transporting sugarcane from independent farms to the Sterling Sugars mill.[35] Facts 21, 22, 33, 34, 113–116. However, when Defendant entered the H-2A program in 2018 and hired foreign workers, including Plaintiffs, it stopped paying overtime for the same type of work for which it had previously paid overtime. Facts 33, 35, 109, 114, 171–172.

Defendant took no steps to affirmatively ascertain whether its change in pay practices (from paying to not paying overtime) was lawful. Facts 165–169. Defendant baldly asserts that its understanding, from sources it declined to identify, was that it was not required to pay overtime to H-2A workers.[36] Fact 171. However, none of Defendant's long-time officers or managers who made pay-related decisions had ever attended a formal training on the FLSA or overtime compliance. Facts 5–9, 34, 115–116, 151–153, 167. In fact, Defendant's own payroll system automatically calculated overtime pay for all hours above 40 or 48 in a workweek, *see* Facts 157, 173, so Defendant must have had to override or intentionally work around the system's automatic overtime calculations to calculate Plaintiffs' wages without overtime pay.

---

[35] Plaintiffs have sought additional discovery pertaining to Defendant's pre-2018 workers who performed the same type of work as Plaintiffs and earned overtime for said work, including pay records, names and contact information (so they can be reached as possible witnesses), and letters that went out to Defendant's 2017 U.S. workers to recruit them for the 2018 season, as required by the H-2A program regulations, *see* Fact 174. Defendant has refused to produce this pre-2018 information that is relevant to Defendant's willfulness and good faith, and which is the subject of Plaintiffs' pending Motion to Compel Discovery. *See* Docs. 59 and 59-1, Section I.A.

[36] The only individual who Defendant has indicated possibly consulting about these issues is its H-2A agent, Ashley Foret Dees, who happens to be an attorney. *See* Facts 158, 165–169. However, when Plaintiffs sought discovery of information and communications pertaining to Mrs. Dees to test Defendant's claim of good faith, Defendant and Dees filed a motion to quash arguing that the attorney-client privilege bars discovery of their communications. *See* Docs. 62, 68, 69, and 88. Defendant has expressly stated that its assertion of good faith does *not* rely on the "advice of counsel" and that it will not rely on any such advice to support its claim of having acted in good faith. Doc. 69, at 9. Thus, pursuant to Rule 37(c) and (d), Defendant cannot now rely on any advice from Mrs. Dees to support its claim of good faith when it has asserted privilege to block Plaintiffs from discovering the content of those communications by asserting privilege. *See* Doc. 88, at 15–19.

The H-2A regulations to which Defendant swore compliance expressly state that "[t]he FLSA operates independently of the H-2A program and has specific requirements that address payment of wages, including deductions from wages, the payment of Federal minimum wage *and payment of overtime*." 20 C.F.R. § 655.135(e) (emphasis added); *see also* 20 C.F.R. § 655.132 (providing that an H-2A labor contractor such as Defendant must "comply with all the assurances, guarantees, and other requirements contained in this part, including § 655.135, and in part 653, subpart F, of this chapter"). Notwithstanding this specific advisory from ETA about the possibility that Defendant might have to pay overtime, Defendant made no effort to act on ETA's notice by investigating whether it had to pay overtime. Facts 151–153, 165–169. If no H-2A worker were entitled to overtime, as Defendant claims to believe, then there would be no need for the regulations to expressly remind employers to make assurances that they will comply with their FLSA overtime obligations. Even more damningly, after Plaintiffs sent a demand letter to Defendant and filed this lawsuit in the fall of 2021, putting Defendant on notice of these overtime violations, Defendant still did not change its pay practices in any way for the 2021 season during which Plaintiffs were employed. Fact 172.

The record further shows that Defendant understood that the H-2A program is intended for agricultural work. Fact 154. However, the work Defendant intended for Plaintiffs to actually perform was not agricultural. Facts 145–147, 160. Despite that Sterling Sugars, LLC had been using non-agricultural H-2B workers for decades, meaning that Defendant, which shared officers and managers with Sterling Sugars, knew how to utilize that process for non-agricultural labor needs, Defendant instead engaged the services of a different, new H-2 agent for these alleged agricultural jobs. Facts 49, 158, 162–163, 176. Yet Defendant offered no reason whatsoever to substantiate its belief that the work was agricultural. Facts 165–169. That Defendant had paid

overtime for the *exact* same work in the past belies such belief. Plaintiffs' immigration status as H-2A temporary nonimmigrants has no bearing on whether the type of work they performed qualifies as agriculture under wage-and-hour law, and Defendant has provided no evidence of from where its claimed belief to the contrary came. And, while Defendant's CEO and General Manager, who made Defendant's pay practice decisions, claim to have extensive knowledge rooted in their decades of experience in the sugarcane industry, Facts 5–8, 34, 115–116, 156–157, in asserting good faith they claim to be completely unaware of a 1967 Fifth Circuit case explicitly holding that workers performing the exact same tasks as Plaintiffs, i.e., transporting sugarcane from independent farms to a sugar mill and working as mechanics, do not fall within the FLSA's agricultural exemption, *see Osceola Farms*, 372 F.2d at 587–90; Section I, above.

That Defendant misrepresented to USDOL that Plaintiffs would engage in agricultural work exempt from overtime pay indicates Defendant not only knew of the FLSA and its overtime requirements, but also attempted to circumvent those requirements. The plain reading of Defendant's job descriptions, Facts 43–44, do not put the jobseeker on notice that the actual work to be performed does not occur in a sugarcane field, but rather required a special driver's license authorizing employees to drive commercial heavy trucks on the road for over 80 hours a week. Defendant's job descriptions refer to "operation of cane harvester to cut and remove leaves from crop; loading pieces of sugarcane into wagons" and use vague terms such as "haul" and "unload" sugarcane, making the work sound agricultural, when in fact *no* workers harvested sugarcane in 2018, and in subsequent seasons only 21 of 169 requested workers (2019), 22 of 200 requested workers (2020), and 24 of 203 requested workers (2021) were identified as "field workers." Facts 18, 29–30, 42, 131–132. Otherwise, as explained in Section I above, Defendant has identified no other workers who worked in a field, and Plaintiffs undisputedly performed no

agricultural work. Facts 131, 133, 137–138. From the outset, Plaintiffs and other H-2A workers were recruited to drive heavy trucks and were required to present a driver's license that authorized them to drive commercial heavy trucks before they were hired. Fact 160. While the vast majority of Defendant's H-2A workers, including Plaintiffs, worked as truck drivers for Defendant, neither the word "truck" nor the word "driver" appear anywhere in Defendant's job description. Fact 43–44. Defendant's H-2A job order further falsely represented that the "anticipated" hours of work would average 40, when in fact the job had always averaged close to 12 hours daily, seven days a week (or 84 hours weekly), twice what Defendant advertised. Facts 110–111, 177. Defendant's Office Manager, who supervised Defendant's H-2A workers, conceded that 40 hours listed in the H-2A job order did not conform to the 84 hours per week typically averaged by Defendant's H-2A workers. Fact 177.

From its parent company's long-time use of the non-agricultural H-2B program, Defendant was also aware that the H-2B program required payment of the OEWS prevailing wage, to avoid undercutting U.S. wages for similar work, and that H-2B visas were subject to a numerical cap each year (unlike H-2A visas), which had previously caused delay to Sterling Sugars, LLC' timely receiving its H-2B workers. Facts 162–163, 178. Defendant believed that its former truck drivers left for higher paying jobs elsewhere, in part because of a nationwide driver shortage. Fact 150. Defendant also testified that its financial wellbeing depended on harvested sugarcane getting to the mill quickly, ideally within 24 hours, or the sugar content would decline. Fact 27. So a delay in obtaining H-2B workers would have hurt the company. Rather than acting reasonably and in good faith, Defendant willfully misused the H-2A program to obtain skilled non-agricultural workers at a much lower cost, by not paying overtime and paying only the

AEWR, which was significantly lower than the applicable H-2B OEWS prevailing wage for heavy and light truck drivers and mechanics.

On these facts, Defendant has failed to present "plain and substantial" evidence of its subjective good faith or innocent frame of mind, or its objectively reasonable grounds for believing its failure to pay Plaintiffs overtime complied with the FLSA. The record indicates the opposite—that Defendant's actions were willful or made with reckless disregard as to its obligations under the FLSA, as opposed to made in "good faith." Defendant's failure to pay Plaintiffs overtime cannot be reasonable when it suddenly stopped paying overtime for the same type of work between 2017 and 2018, but took no steps to investigate or determine whether that change was lawful and when the H-2A regulations to which Defendant swore compliance expressly remind employers of their FLSA overtime obligations *to H-2A workers*. 20 C.F.R. § 655.135(e). Defendant's purported innocent frame of mind is further contradicted by its H-2A job orders, which falsely advertise the work as being agricultural (and with no mention of driving heavy trucks) and averaging an anticipated 40 hours weekly (when in fact it was twice that much). Regardless, the Court should exercise discretion to award liquidated damages here because liquidated damages are considered compensatory, not punitive, and are intended to compensate workers for their wages having been unlawfully retained, for the last four years in the case of some Plaintiffs. *See Brooklyn Sav. Bank*, 324 U.S. at 707; 29 U.S.C. § 260. For these reasons, an award of liquidated damages to Plaintiffs is proper.

### 3. <u>Plaintiffs Are Entitled to the FLSA's Three-Year Statute of Limitations Under 29 U.S.C. § 255 for Willful Violations.</u>

The record demonstrates that Defendant's failure to pay overtime was willful, entitling Plaintiffs to the FLSA's three-year statute of limitations pursuant to 29 U.S.C. § 255. A violation is "willful" if the employer either "knew or showed reckless disregard" for "whether its conduct

was prohibited by the statute." *Reich v. Bay, Inc.*, 23 F.3d 110, 117 (5th Cir. 1994) (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)). An employee must demonstrate that his employer's violation was more than negligent to achieve the three-year statute of limitations. *McLaughlin*, 486 U.S. at 134–35. An employer acts willfully not only when it knows its pay structure violates the FLSA, but also when it simply "disregard[s] the possibility that it might be violating the FLSA" or turns a "blind eye" to an egregiously disproportionate ratio between hours worked and wages paid. *Ramos v. Al-Bataineh*, 599 F. App'x 548, 551 (5th Cir. 2015). An employer's violation of the FLSA is also willful when it has been put on notice that its pay practices violate the FLSA yet continues those practices without any further investigation. *Reich,* 23 F.3d at 117; *Singer*, 324 F.3d at 821–22.

Defendant did not just passively fail to investigate its FLSA obligations or to seek advice about its ongoing overtime practices. Rather, as shown by the facts in Section IV.B.2. above, Defendant was aware of overtime laws, had always paid overtime, and affirmatively *changed* its overtime practices between 2017 and 2018. Facts 33, 35, 53, 59, 109, 112-116, 155–157, 171–172. Defendant cannot cite to the source or basis for its stated belief in the lawfulness of that change. Facts 165–169, 171. Defendant purposefully crafted a job description that made the work sound agricultural and somehow never used the words "truck driver," despite that being a licensed commercial truck driver was a prerequisite for job applicants and the primary job duty of its H-2A workforce. Facts 43–44, 160–161. Defendant further advertised the job with an "anticipated" 40 hours per week (i.e., no overtime), despite that its workers had repeatedly averaged twice that many hours. Fact 177. By characterizing the work as if it were agricultural, Defendant was approved for H-2A visas and attempted to use that as a cover for not paying overtime and for paying the AEWR. In using the H-2A program, which has no visa cap,

Defendant also avoided the H-2B program's annual numerical caps, which could have resulted in Defendant not getting workers or a delay in their arrival. Not only did Defendant show reckless disregard for whether its changed pay practices complied with the law, including by continuing to not pay overtime after this lawsuit was filed, Defendant went to great lengths to circumvent the primary policy goals of the H-2 programs, which would have required properly advertising the heavy truck driver jobs at the prevailing wage and with overtime to determine if U.S. workers were willing and able to perform the job *on those lawful terms*. This evasion demonstrates that Defendant's pay practices were willful.

### C. Plaintiffs Are Entitled to Reasonable Attorney's Fees.

In addition to unpaid wages and liquidated damages, under the FLSA and the LWPA, the Court "shall" award the plaintiffs reasonable attorney's fees to be paid by the defendant. 29 U.S.C. § 216(b); La. Stat. Ann. § 23:632. Thus, to the extent the Court grants Plaintiffs summary judgment on their FLSA overtime and LWPA claims, Defendant should also be ordered to pay reasonable attorney's fees. If the Court rules in their favor, Plaintiffs will file a fee petition with the Court, unless the parties are able to reach agreement on a reasonable attorney's fee amount.

## CONCLUSION

The undisputed, material facts demonstrate that Plaintiffs were not employed in agriculture and, thus, Defendant violated Plaintiffs' rights by failing to pay Plaintiffs overtime at a rate of 1.5 times their regular rate of pay under the FLSA and failing to pay Plaintiffs the lawfully required OEWS prevailing hourly wage rate for the non-agricultural work performed, pursuant to the terms of their H-2A employment contracts or under a theory of unjust enrichment and under the LWPA. For the reasons stated, Plaintiffs respectfully request that the Court grant Plaintiffs' motion for partial summary judgment and issue an order that:

1) The work performed by Plaintiffs was not "agricultural" as defined by the FLSA or the H-2A program regulations under which Plaintiffs were hired;

2) Accordingly, Defendant violated the FLSA when it did not pay Plaintiffs overtime wages of 1.5 times their regular rate of pay for hours above 40 in a workweek (Count I, Pls.' Second Am. Complaint, Doc. 66);

3) The "regular rate" of pay for purposes of Plaintiffs' FLSA claims is the minimum lawful rate at which Plaintiffs could have been paid under their contracts and the H-2 regulations for the non-agricultural work they performed, corresponding to the arithmetic mean of the wages of workers similarly employed in the area of intended employment, as published by the BLS OEWS, which was:

    a. $20.42 per hour for Plaintiffs driving heavy trucks (SOC 53-3032) for the period from July 2018 to June 2019;

    b. $19.52 per hour for Plaintiffs driving heavy trucks (SOC 53-3032) for the period from July 2019 to June 2020;

    c. $20.33 per hour for the Plaintiffs driving heavy trucks (SOC 53-3032) for the period from July 2020 to June 2021;

    d. $19.76 per hour for the Plaintiffs driving heavy trucks (SOC 53-3032) for the period from July 2021 to June 2022;

    e. $18.26 per hour for the Plaintiffs driving light trucks (SOC 53-3033) for the period from July 2018 to June 2019;

    f. $15.15 per hour for Plaintiffs driving light trucks (SOC 53-3033) for the period from July 2019 to June 2020;

g. $14.47 per hour for Plaintiffs driving light trucks (SOC 53-3033) for the period from July 2020 to June 2021;

h. $15.54 per hour for Plaintiffs driving light trucks (SOC 53-3033) for the period from July 2021 to June 2022;

i. $19.46 per hour for Plaintiffs Jesus Antonio Rodriguez Penuelas and Pedro Daniel Romero Ruelas employed as bus and truck mechanics (SOC 49-3031) for the period from July 2020 to June 2021; and

j. $19.62 per hour for Plaintiffs Jesus Antonio Rodriguez Penuelas and Pedro Daniel Romero Ruelas employed as bus and truck mechanics (SOC 49-3031) for the period from July 2021 to June 2022.

4) Defendant similarly breached its employment contracts with Plaintiffs when it paid them straight time at the Adverse Effect Wage Rate (AEWR), a wage rate applicable to agricultural workers in the H-2A program, instead of the highest applicable prevailing wage rate for the non-agricultural work they performed (Count II, Pls.' Second Am. Complaint, Doc. 66), as itemized in subparts a. through j. above;

5) Alternatively, Defendant was unjustly enriched, and Plaintiffs were impoverished, by Defendant's failure to pay overtime and the applicable prevailing wage rate for the non-agricultural work they performed (Count IV, Pls.' Second Am. Complaint, Doc. 66);

6) Defendant violated Plaintiffs' rights under the LWPA by failing to pay all their wages due within 15 days of their last day of employment in each season, including for failing to pay overtime and the applicable prevailing wage rate for the non-agricultural work they performed (Count III, Pls.' Second Am. Complaint, Doc. 66);

7) Defendant owes Plaintiffs the amounts of unpaid actual wage damages and liquidated damages contained in the Damages Table attached to Plaintiffs' Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment as Exhibit 4;

8) Defendant's violations of the FLSA were not made in good faith and were willful; and

9) Defendant must pay Plaintiffs' reasonable attorney's fees for their FLSA and LWPA claims.

Respectfully submitted,

/s/ Caitlin Berberich
Caitlin Berberich, TN Bar No. 025780
*Trial Attorney
*Admitted Pro Hac Vice*
SOUTHERN MIGRANT LEGAL SERVICES
A Project of Texas RioGrande Legal Aid, Inc.
311 Plus Park Blvd., Ste. 135
Nashville, TN 37217
Telephone: (615) 538-0725
Facsimile: (615) 366-3349
cberberich@trla.org

/s/ Nicole Bucheri
Nicole Bucheri, TX Bar No. 24095388
*Admitted Pro Hac Vice*
TEXAS RIOGRANDE LEGAL AID, INC.
1206 E. Van Buren St.
Brownsville, Texas 78520
Telephone: (956) 982-5552
Facsimile: (956) 541-1410
nbucheri@trla.org

/s/ Daniel Davis
Daniel Davis, LA No. 30141
*Admitted to Practice in W.D. La.*
Estes Davis Law, LLC
4465 Bluebonnet Blvd, Suite A
Baton Rouge, LA 70809
Telephone: (225) 336-3394

Facsimile: (225) 384-5419
dan@estesdavislaw.com

ATTORNEYS FOR PLAINTIFFS